Szaferman, Lakind, Blumstein & Blader, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, N.J. 08648
(609) 275-0400

Levy Konigsberg, LLP
101 Grovers Mill Road, Suite 200
Lawrenceville, N.J. 08648
(609) 720-0400

By: Leah C. Kagan (ID # 013602009)
Attorneys for Plaintiff

| | |
|---|---|
| **HAROLD BROWN,**<br><br>**Plaintiff,**<br><br>v.<br><br>**CATERPILLAR, INC., et al.,**<br><br>**Defendants.** | Hon. William H. Walls, U.S.D.J.<br>Hon. Cathy L. Waldor, U.S.M.J.<br><br>Civil Action No.: 2:15-cv-02687-WHW-CLW<br><br>**DECLARATION OF LEAH KAGAN** |

**LEAH C. KAGAN**, being of full age, certifies as follows:

1. I am an associate at the law firm of Levy Konigsberg LLP, attorneys for the Plaintiff, and I submit this Declaration in support of Plaintiff's Motion for Remand.

2. This case concerns Plaintiff-Decedent Harold Brown's development of malignant pleural mesothelioma as a result of his exposure to asbestos. Briefly stated, Mr. Brown's only known and identifiable exposures to asbestos were from his work as an automotive mechanic – specifically on engines – from approximately 1947 until 1978.[1] Mr. Brown suffered a significant exposure to asbestos from his work as a mechanic.

---

[1] Based on Mr. Brown's service in the United States Navy during World War II, defendants will likely attempt to blame Mr. Brown's exposure to asbestos on the navy ship. However, no defendant, including Removing Defendants, has produced any evidence during the course of discovery that Mr. Brown was actually exposed to asbestos and how he was exposed to asbestos from his navy service.

{00360437.DOCX}                    1

## BASIS FOR NAMING NEW JERSEY DEFENDANTS

3. The Complaint in this matter was filed on May 2, 2014, naming several automotive and equipment companies as defendants, including New Jersey defendants Honeywell International, Inc. f/k/a AlliedSignal Inc., as successor-in-interest to the Bendix Corporation ("Honeywell/Bendix"), Pneumo-Abex ("Abex"), and Ingersoll-Rand Company ("IR"). A true and correct copy of the Complaint is attached hereto as **Exhibit A**.

4. Plaintiff named Honeywell/Bendix as a defendant in the Complaint because Plaintiff-Decedent Harold Brown recalled that his longtime employer, Thul Auto, relined automotive brakes with Bendix brand brake linings during the time period he worked on the machine shop floor rebuilding engines. Moreover, as counsel for other plaintiffs in New Jersey, I was aware that Thul Auto relined and sold Bendix brand brakes during the relevant time period. A true and correct copy of relevant portions of the discovery deposition of Vladimir "Danny" Danysh is attached hereto as **Exhibit B at 205:6-206:1, 209:11-25, 234:15-20, 238:18-25.**[2]

5. Plaintiff named Abex as a defendant in the Complaint because I, as counsel for Plaintiff with experience in automotive asbestos cases in New Jersey, was aware that Abex supplied brake linings to Mack Trucks, another defendant in the case. A true and correct copy of Mack Trucks, Inc.'s Responses to Plaintiff's Second Set of Interrogatories, dated March 13, 1997, is attached hereto as **Exhibit C at 7**.

6. Plaintiff named IR as a defendant in the Complaint because Plaintiff-Decedent Harold Brown recalled working on IR compressors which were known to contain asbestos-containing component parts during the relevant time period. *See* **Exhibit D**.

---

[2] Danny Danysh is a client of Levy Konigsberg, LLP who had testified to purchasing Bendix brake linings at Thuls in New Jersey. Mr. Danysh's testimony corroborated Mr. Brown's recollection of Bendix brake relining at Thuls and was one of the basis for Plaintiff to name Bendix as a defendant in the present matter.

{00360437.DOCX}                    2

### PLAINTIFF'S PROOFS AGAINST NEW JERSEY DEFENDANTS

7. In June 2014, prior to the discovery deposition of Plaintiff-Decedent Harold Brown, Plaintiff served all counsel with certified Answers to Part I Interrogatories. A true and correct copy of Plaintiff's Certified Answers to Part I Interrogatories, dated June 3, 2014, is attached hereto as **Exhibit D**. In response to the question "Identify all jobs and projects on which you worked with or around asbestos or materials containing asbestos," Mr. Brown identified various automotive machine shops, including Thul Auto in Plainfield, New Jersey ("Thuls"), where he worked with and around others working with asbestos-containing automotive parts, including brakes. *Id.* **at 4-6**. Aside from identifying brake linings as a source of exposure, Mr. Brown specifically identified Mack Trucks, Inc. – a company to which Abex supplied asbestos brake linings, as well as IR as a source of potential asbestos exposure. *Id.*

Honeywell/Bendix

8. During the discovery deposition, which occurred on June 9, 2014 and June 10, 2014, counsel for Honeywell/Bendix – Ethan Stein, Esq. – took the lead and questioned Mr. Brown on behalf of all defense counsel. A true and correct copy of relevant portions of the discovery deposition of Harold Brown is attached hereto as **Exhibit E**. Mr. Brown testified that while he was employed as an engine mechanic at Thuls from 1947 to 1964, Thuls brake mechanics relined brakes using Bendix brand brake linings. *Id.* **at 91:8-15, 144:15-145:2, 148:4-16**. This testimony was entirely consistent with the testimony of Vladimir "Danny" Danysh who purchased Bendix brand brakes from Thuls during the relevant time period. *See* **Exhibit B at 205:6-206:1, 209:11-25, 234:15-20, 238:18-25**.

9. Honeywell/Bendix admits that it manufactured and distributed asbestos-containing brakes and other friction products during the period that Harold Brown was working as an

automotive mechanic at Thuls. A true and correct copy of relevant portions Honeywell International Inc.'s Supplemental Responses to Plaintiffs' First Standard Set of Liability Interrogatories and Request for Production of Documents is attached hereto as **Exhibit F at 12-13, 93**. Honeywell/Bendix manufactured and distributed multiple asbestos-containing automotive parts including brake linings, disc brake pads, and brake blocks. A true and correct copy of Honeywell International, Inc.'s Amended Answers to Plaintiffs' Master Set of Interrogatories is attached hereto as **Exhibit G at 2-3**; s*ee also* a true and correct copy of Allied Corporation Bendix Friction Materials Division Material Safety Data Sheet, 1986, attached hereto as **Exhibit H**.

10. Honeywell/Bendix produced asbestos-containing components until at least 1988. *See* **Exhibit G at 2-3**. Brake pads and linings manufactured by Honeywell/Bendix contained an average of 50% chrysotile asbestos fiber by weight. *See* **Exhibit F at 94**.  Honeywell/Bendix also confirmed that it continued to manufacture and distribute asbestos-containing friction products until at least 2003, more than thirty years after its Research Laboratories conducted Environmental Protection Agency tests on asbestos emission from brake lining. *Id.*; *see also* a true and correct copy of Friction Materials Standards Institute, Inc. letter dated September 30, 1971 to All Members, attached hereto as **Exhibit I**.

11. During the time period Harold Brown worked at Thuls around others relining Honeywell/Bendix asbestos brakes, Honeywell/Bendix knew of the hazards of asbestos. As early as 1949, Honeywell/Bendix was a member of the Friction Materials Standards Institute ("FMSI") and had a representative on FMSI's Board of Directors. A true and correct copy of the Members List for Annual Meetings of the FMSI dated 1949 is attached hereto as **Exhibit J**. Honeywell/Bendix was also a member of FMSI's Asbestos Study Committee. A true and

{00360437.DOCX}                                    4

correct copy of the Minutes of the Meeting of the Asbestos Study Committee, dated August 17, 1972, is attached hereto as **Exhibit K**.

Abex

12. During the discovery deposition of Harold Brown, Mr. Brown specifically testified to working on truck engines for Mack Trucks, Inc. while employed as a mechanic at Thuls. *See* **Exhibit E at 256:23-257:20**. He further testified to other mechanics at Thuls working on relining brakes. *Id.* **at 144:15-145:2, 148:4-16**.

13. Defendant Abex supplied Mack Trucks, Inc. with asbestos-containing brake linings during the years in which Mr. Brown was employed at Thuls. Mack Trucks, Inc. admits that it sold trucks with brake lining, clutch facing, and gasket components that contained asbestos. *See* **Exhibit C at 6**. Mack Trucks, Inc. did not stop using asbestos brake linings until at least 1979, well after Mr. Brown stopped working at Thul. *Id.* More importantly, Mack Trucks, Inc. admits that it purchased brake lining products from American Brake Blok, now New Jersey Defendant Abex. *Id.* **at 7**.

14. New Jersey Defendant Abex admits that over its more than one hundred year history, it manufactured asbestos-containing automotive friction products, including brake pads and linings and clutch facings, containing approximately 25% to 70% chrysotile asbestos. A true and correct copy of Supplemental Responses of Defendant Pneumo Abex LLC, Successor in Interest to Abex Corporation, to Plaintiffs' Standard General Order 12 Interrogatories to Friction Defendants, dated October 18, 2010 is attached hereto as **Exhibit L at 8**. Furthermore, Abex continued to manufacture and sell asbestos-containing automotive friction products until at least 1987, well after Mr. Brown stopped working on and around Mack brand trucks. *Id.* **at 12**.

{00360437.DOCX}                                5

15. Abex was aware of the health issues associated with asbestos *prior to* OSHA's existence, during the time period Mr. Brown was employed at Thuls. A true and correct copy of relevant portions of the deposition of Charles Blackwell is attached hereto as **Exhibit M at 12-13, 32**. Abex was aware that the process of cutting, grinding or drilling asbestos brake linings could result in a release of asbestos fibers. *Id.* **at 94**.  Moreover, just like Honeywell/Bendix, Abex was a member of FMSI.

Ingersoll-Rand

16. Plaintiff-Decedent identified New Jersey Defendant IR's compressors in his certified Answers to Part I Interrogatories. *See* **Exhibit D at 4-6**.

17. For over 125 years, IR manufactured pumps and compressors that included asbestos-containing components and asbestos-containing replacement parts such as gaskets and packing. A true and correct copy of Ingersoll-Rand Company's Objections and Answers to Standing Order No. 1 Interrogatories is attached hereto as **Exhibit N at 4**. IR also admits that it purchased chrysotile asbestos to be used in the products it manufactured. *Id.* IR distributed asbestos-containing products until at least 1979. A true and correct copy of a Purchase Order, dated May 1, 1979 is attached hereto as **Exhibit O**.

18. Accordingly, Plaintiff had sufficient evidence of liability in order to name and pursue Honeywell/Bendix, Abex, and IR as defendants in this matter.

## HONEYWELL/BENDIX'S ERRONEOUS DISMISSAL

19. The Stipulation of Dismissal of New Jersey Defendant Honeywell/Bendix Removing Defendant relies upon was filed erroneously.

20. At the conclusion of the discovery deposition of Plaintiff-Decedent Harold Brown, Plaintiff engaged in discovery with Thuls and other defendants in order to determine the extent of Mr. Brown's exposure to the brake work done at Thuls. It became evident that although Mr. Brown likely suffered some exposure to asbestos from Honeywell/Bendix brakes at Thuls, the exposure was not sufficient to overcome the standard of proof at Summary Judgment.

21. During the pendency of discovery in the Brown matter, Levy Konigsberg, LLP engaged in confidential settlement discussions with Honeywell/Bendix on a number of cases being handled by the firm, including the Brown matter. On October 3, 2014, Levy Konigsberg, LLP entered into confidential settlement agreements for a number of cases with Honeywell/Bendix. A true and correct copy of the October 3, 2014 settlement confirmation letter, redacted due to the confidentiality of the amounts, is attached hereto as **Exhibit P**.

22. During these numerous settlement discussions, Levy Konigsberg, LLP agreed that there were significant weaknesses in the Brown matter with respect to causation and Honeywell/Bendix. As a result, Levy Konigsberg, LLP informed counsel for Honeywell/Bendix that it would not oppose a motion for Summary Judgment if one was failed. Due to similar weaknesses, Plaintiff decided not to oppose the Summary Judgment motions filed by Abex and IR. *See* **Exhibit P**. As local New Jersey counsel for Honeywell/Bendix is aware, Levy Konigsberg, LLP does not normally dismiss defendants voluntarily and requires defendants to file motions for Summary Judgment. One of the reasons for this procedure, which counsel for Honeywell/Bendix is quite familiar with, is to provide co-defendants with cross-claims the opportunity to oppose the Motion if they so choose and thereby eliminate the possibility of having the moving defendant included on the verdict sheet at the time of trial.

23. Understanding and respecting this longstanding procedure, Plaintiff was surprised to receive a copy of a filed Stipulation of Dismissal on April 6, 2015 from counsel for Honeywell/Bendix. A true and correct copy of the email to all counsel enclosing the Stipulation of Dismissal is attached hereto as **Exhibit Q**. A true and correct copy of the filed Stipulation of Dismissal is attached hereto as **Exhibit R**. The Stipulation of Dismissal was signed by Robyn Blumenkranz, Esq. of Levy Konigsberg, LLP, a new associate in the settlement department, unfamiliar with the dismissal procedure in New Jersey.[3]

24. Upon receipt of the filed Stipulation of Dismissal, I immediately reached out to Ethan Stein, counsel for Honeywell/Bendix who executed the Stipulation of Dismissal. A true and correct copy of Plaintiff's April 6, 2015 email to Ethan Stein, noting "We have a problem," is attached hereto as **Exhibit S**. Receiving no response, I emailed again, explaining the situation and requesting that Honeywell/Bendix move to vacate the Stipulation of Dismissal. A true and correct copy of Plaintiff's April 6, 2015 email to Ethan Stein is attached hereto as **Exhibit T**. Mr. Stein replied, apologized for the misunderstanding, and acknowledged that he simply forgot that Levy Konigsberg, LLP does not sign stipulations of dismissal. A true and correct copy of Honeywell/Bendix's reply to Plaintiff's email regarding the erroneous Stipulation of Dismissal is attached hereto as **Exhibit U**.[4] In fact, Mr. Stein explicitly stated that "I'll have my secretary prepare letters to the court to vacate the stipulations of dismissal." *Id.* Mr. Stein noted he was away on vacation.

---

[3] Indeed, the dismissal procedure at Levy Konigsberg, LLP varies by jurisdiction and Ms. Blumenkranz was unaware of the importance and need for defendants in New Jersey to file Summary Judgement motions to be dismissed.

[4] What is interesting to note is that the agreement that Plaintiff would not oppose Honeywell/Bendix's Motion for Summary Judgment thereby dismissing Honeywell/Bendix occurred on October 3, 2014. Mr. Stein waited until March 2015 to send stipulations of dismissal to Levy Konigsberg, LLP, curiously not to the attorneys handling the cases or the settling partner, but to a new administrative attorney.

25. Instead of keeping to the terms of the agreement laid out in the email correspondence from April 6, 2015 and submitting a motion to vacate the clearly erroneous Stipulation of Dismissal, on April 13, 2015, via telephone call, Mr. Stein informed me that he had "concerns" about filing such a motion and the perception co-defendants will have of him. Finding this delay and excuse strange, I suggested we reach out to Special Master Agatha Dzikiewicz for direction. Mr. Stein emailed Special Master Dzikiewicz on April 13, 2015 again admitting that the Stipulation of Dismissal was entered into erroneously ("inadvertently signed by a junior attorney) and asking for guidance on how to vacate the filed stipulation. A true and correct copy of Honeywell/Bendix's email to Special Master Dzikiewicz dated April 13, 2015 is attached hereto as **Exhibit V**. Special Master Dzikiewicz responded "let me think of a solution before we chat." A true and correct copy of Special Master Dzikiewicz's response dated April 13, 2015 is attached hereto as **Exhibit W**.

26. Before Special Master Dzikiewicz had an opportunity to meaningfully respond, on April 15, 2015, only two days after Honeywell/Bendix expressed "concerns" about vacating the erroneous Stipulation of Dismissal and the perception its co-defendants will have, Removing Defendant removed the Brown matter from Special Master Dzikiewicz's jurisdiction, on diversity grounds as a result of the dismissal of Honeywell/Bendix. Plaintiff received notice via email. A true and correct copy of Removing Defendant's email dated April 15, 2015 is attached hereto as **Exhibit X**.

## CONCLUSION

27. The facts above demonstrate that Plaintiff-Decedent Harold Brown's matter belongs in New Jersey State Court. Plaintiff named New Jersey Defendants Honeywell/Bendix, Abex, and IR

based on actual product identification, knowledge regarding supply and distribution of components parts, and exposure probability. Plaintiff adduced proofs of liability against Honeywell/Bendix, Abex, and IR. Moreover, it was never Plaintiff's intention to dismiss Honeywell/Bendix voluntarily. New Jersey Defendant Honeywell/Bendix admits that the Stipulation of Dismissal was erroneously executed and should be vacated. Accordingly, Plaintiff respectfully requests this matter be Remanded back to State Court.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment by law.

LEVY KONIGSBERG, LLP
*Attorneys for Plaintiff*

_____
Leah C. Kagan

Dated: May 5, 2015

# Exhibit A

SZAFERMAN, LAKIND,
  BLUMSTEIN & BLADER , P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, N.J. 08648
(609) 275-0400

LEVY KONIGSBERG, LLP
101 Grovers Mill Road, Suite 200
Lawrenceville, N.J. 08648
(609) 720-0400
Attorneys for Plaintiff
Robert E. Lytle (NJ ID No. 046331990)

RECEIVED & FILED

2014 MAY -2  A 11: 37

MASS TORT CIVIL DIV
MIDDLESEX VICINAGE

| | |
|---|---|
| HAROLD BROWN,<br><br>                     Plaintiff,<br><br>          v.<br><br>CATERPILLAR, INC.; CRANE CO.; CUMMINS, INCORPORATED; DANA COMPANIES, LLC, f/k/a Dana Corporation, individually and as successor to Victor Gaskets and Spicer Clutches; DEERE & COMPANY; FEDERAL MOGUL ASBESTOS PERSONAL INJURY TRUST, as successor-in-interest to Felt Products Manufacturing Co.; FORD MOTOR COMPANY; THE GOODYEAR TIRE AND RUBBER COMPANY; HONEYWELL INTERNATIONAL INC., as successor-in-interest to The Bendix Corporation; INGERSOLL-RAND COMPANY; MACK TRUCKS, INC.; MCCORD CORPORATION, individually and Successor in interest to A.E Clevite, Inc. and J.P, Industries; PACCAR, Incorporated, individually and as successor to Kenworth Truck Company and Peterbilt Motors Company; PNEUMO-ABEX, LLC, as successor-in-interest to Abex Corporation, f/k/a American Brake Shoe Company UNION CARBIDE CORPORATION; JOHN DOE CORPORATION 1-50; JOHN DOE 51-100;<br>                     Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, MIDDLESEX COUNTY DOCKET NO.: MID-L-2641 -14AS<br><br>**Civil Action - Asbestos Litigation**<br><br><br><br><br><br><br><br>COMPLAINT, JURY DEMAND, DEMAND FOR ANSWERS TO STANDARD INTERROGATORIES AND DESIGNATION OF TRIAL COUNSEL |

1139935.1

Plaintiff, Harold Brown, by way of complaint against Defendants alleges and says:

### PARTIES - PLAINTIFF

1. Plaintiff, Harold Brown, resides at 2334 Pigeon Roost Road, Pulaski, Tennessee, 38478.

2. Plaintiff, Harold Brown, suffered exposure to respirable asbestos fibers from his work as a heavy equipment mechanic at Thuls Auto Parts, Machinery Maintenance, and DNS Construction in New Jersey from approximately 1947 through 1978. Mr. Brown's responsibilities involved working with asbestos-containing heavy equipment, including engines, transmissions, compressors, brakes, and clutches, as well as working with, and being in the immediate vicinity of others working with, asbestos-containing friction products, including but not limited to brakes, clutches, and gaskets. Mr. Brown's work with and around asbestos-containing heavy equipment and friction products at Thuls Auto Parts, Machinery Maintenance, and DNS Construction generated respirable asbestos dust to which he was exposed. As a result of these exposures Harold Brown was exposed to asbestos fibers, dust, and other finished and/or unfinished asbestos products manufactured, supplied and/or distributed by Defendants.

3. Plaintiff, Harold Brown, further suffered exposure to respirable asbestos from his work maintaining, removing, and replacing asbestos-containing products on farm equipment. Mr.

1139935.1                           2

Brown's work with asbestos-containing farm equipment generated respirable asbestos dust. As a result of these exposures Harold Brown was exposed to asbestos fibers, dust, and other finished and/or unfinished asbestos products manufactured, supplied and/or distributed by Defendants.

4.   As a direct and proximate cause of the above exposures, Plaintiff, Harold Brown, contracted mesothelioma and has suffered and continues to suffer from various diverse injuries and attendant complications.

<u>PARTIES - DEFENDANTS</u>

5. Defendants, CATERPILLAR, INC.; CRANE CO.; CUMMINS, INCORPORATED; DANA COMPANIES, LLC, individually and as successor to Victor Gaskets and Spicer Clutches; DEERE & COMPANY; FEDERAL MOGUL ASBESTOS PERSONAL INJURY TRUST, as successor-in-interest to Felt Products Manufacturing Co.; FORD MOTOR COMPANY; THE GOODYEAR TIRE AND RUBBER COMPANY; HONEYWELL INTERNATIONAL INC., as successor-in-interest to The Bendix Corporation; INGERSOLL-RAND COMPANY; MACK TRUCKS, INC.; MCCORD CORPORATION, individually and Successor in interest to A.E Clevite, Inc. and J.P, Industries; PACCAR, Incorporated, individually and as successor to Kenworth Truck Company and Peterbilt Motors Company; PNEUMO-ABEX, LLC, as successor-in-interest to Abex Corporation, f/k/a American Brake Shoe Company; and UNION CARBIDE CORP., were manufacturers, suppliers or distributors of asbestos fibers, dust, minerals,

1139935.1                        3

particles and other finished and unfinished asbestos products that Plaintiff, Harold Brown, used or to which he was exposed.

6. John Doe Corporations 1 through 50 are the fictitious names of corporations, partnerships, and/or other business entities whose identities are not presently known, and who mined, manufactured, sold, marketed, installed and/or removed asbestos or asbestos containing products that Plaintiff, Harold Brown, used or to which he was exposed.

7. John Doe Corporations 51 through 100 are the fictitious names of corporations, partnerships, and/or other business entities whose identities are not presently known, and who are the alter egos of or are otherwise responsible for the conduct or liability of those who mined, milled, manufactured, sold, marketed, installed and/or removed asbestos, or asbestos containing products, that Plaintiff, Harold Brown, used or to which he was exposed.

8. The term "Defendants" refers to all of the entities named above.

FIRST COUNT

9. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 8 as though hereinafter set forth at length.

10. The Defendants conduct and/or have conducted business in New Jersey at all times relevant herein. The Defendants breached

1139935.1                                   4

their warranties, both express and implied, for fitness of purpose and merchantability.

11. The Defendants are strictly liable in tort.

12. As a direct and proximate result of Defendants' negligence, breach of warranties, both express and implied, and strict liability in tort, the Plaintiff, Harold Brown, contracted mesothelioma, and has suffered, and continues to suffer, from other various diverse injuries and attendant complications.

13. It was foreseeable to the Defendants that the Plaintiff, Harold Brown, and others similarly situated, would be injured as a result of the Defendants' actions and misconduct.

**WHEREFORE,** Plaintiff demands judgment against the Defendants, jointly and severally for:

   a) Compensatory damages;

   b) Punitive damages;

   c) Pre-judgment and post judgment interest;

   d) Costs;

   e) Attorney fees and litigation expenses; and

   f) Such other relief as the Court may deem just and proper.

<u>SECOND COUNT</u>

14. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 13 as though hereinafter set forth at length.

15. The Defendants, jointly and severally marketed an ultra-

1139935.1                                          5

hazardous product and placed that product in the stream of commerce.

16. As a direct and proximate result of the Defendants' actions, Plaintiff, Harold Brown, contracted mesothelioma and has suffered and continues to suffer from various diverse injuries and attendant complications.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally for:

a) Compensatory damages;

b) Punitive damages;

c) Pre-judgment and post judgment interest;

d) Costs;

e) Attorney fees and litigation expenses; and

f) Such other relief as the Court may deem just and proper.

### THIRD COUNT

17. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 16 as though hereinafter set forth at length.

18. Defendants breached their non-delegable duty to warn and negligently supplied defective materials and products without ensuring that Plaintiff, Harold Brown, and his employers were warned about the dangers of asbestos exposure.

19. Defendants' actions prevented Plaintiff from educating himself on the dangers of asbestos exposure and from taking

action to minimize the risks of exposure.

20.  Defendant's actions prevented Plaintiff's employers from educating Plaintiff, Harold Brown, and other employees, on the dangers of asbestos exposure and from taking action to minimize the risks of exposure in and out of the workplace.

21.  As a direct and proximate result of Defendants' actions and inaction, Plaintiff, Harold Brown, contracted mesothelioma and has suffered and continues to suffer from various diverse injuries and attendant complications.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally for:

a) Compensatory damages;

b) Punitive damages;

c) Pre-judgment and post judgment interest;

d) Costs;

e) Attorney fees and litigation expenses; and

f) Such other relief as the Court may deem just and proper.

### FOURTH COUNT

22. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 21 as though hereinafter set forth at length.

23. Defendants willfully, wantonly and intentionally conspired, and acted in concert, to withhold information from Plaintiff, Harold Brown, his employers, and the general public

1139935.1                           7

concerning the known hazards associated with the use of, and exposure to, asbestos products.

24. Defendants willfully, wantonly and intentionally conspired, and acted in concert, to withhold information from Plaintiff, Harold Brown, his employers, and the public relating to the fact that asbestos fiber inhalation could be fatal.

25. Defendants willfully, wantonly and intentionally conspired, and acted in concert, to disseminate false product safety information to Plaintiff, Harold Brown, his employers and the public.

26. Defendants willfully, wantonly and intentionally conspired, and acted in concert, to prevent the dissemination of information concerning their products' hazards and dangers.

27. Defendants willfully, wantonly and intentionally failed to take appropriate action to minimize the risks of asbestos exposure to Plaintiff, Harold Brown, and the general public.

28. As a direct and proximate result of Defendants' willful, wanton and intentional acts, Plaintiff, Harold Brown, contracted mesothelioma and has suffered and continues to suffer from various diverse injuries and attendant complications.

WHEREFORE, Plaintiff demands judgment against the Defendants, jointly and severally for:

a) Compensatory damages;

b) Punitive damages;

1139935.1                          8

c) Pre-judgment and post judgment interest;

d) Costs;

e) Attorney fees and litigation expenses; and

f) Such other relief as the Court may deem just and proper.

Plaintiff hereby incorporates by reference all allegations set forth in the Standard Complaint, as amended, which is contained in the Asbestos Manual. A copy of the Asbestos Manual which contains the Standard Complaint can be obtained from the Middlesex County Mass Tort Clerk or by visiting the following website:

http://www.judiciary.state.nj.us/mass-tort/asbestos/asbestos_amended_std_complaint.pdf.

## DISCLAIMER OF FEDERAL JURISDICTION

Plaintiff specifically disclaims any federal cause of action or any claim that would give rise to federal jurisdiction. To the extent that any of Plaintiff's asbestos exposure took place on a federal enclave, or to the extent that any of Plaintiff's asbestos exposure occurred on board vessels of the United States military (including Naval ships), or in the construction, maintenance and/or repair of United States military vessels and/or aircraft, Plaintiff's negligence claims against manufacturers, sellers and suppliers of asbestos-containing products installed on such vessels and/or aircraft are not based on the theory of defective design, but rather are based only on the theory of failure to warn. Since there is no evidence that

1139935.1                                    9

the United States Government or any of its military branches, specifically instructed manufacturers from which it purchased asbestos-containing products not to warn about the health hazards associated with exposure to asbestos, there can be no valid claim to federal jurisdiction pursuant to federal enclave, federal officer or federal contractor provisions of the United States Code. This disclaimer pertains to all of Plaintiff's claims, including those of negligence and products liability, as asserted herein.

## JURY DEMAND

Plaintiff demands trial by jury as to all issues of fact so triable.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, notice is hereby given that Moshe Maimon, Esq. is designated as trial counsel in the above captioned matter.

## DEMAND FOR INTERROGATORIES

Pursuant to the Asbestos Litigation General Order, Section VI.B. which can be found at http://www.judiciary.state.nj.us/mass-tort/asbestos/manual/genera lorder1.pdf, Plaintiff hereby demands that the above listed Defendants answer Standard Interrogatories in the form prescribed by the Court and within the time provided by the above referenced Order. A copy of the Standard Interrogatories are contained in the Asbestos Manual and may be obtained from the Clerk or by

1139935.1                               10

visiting the following website:

http://www.judiciary.state.nj.us/mass-tort/asbestos/manual/attach e.pdf

### CERTIFICATION PURSUANT TO R. 4:5-1

Pursuant to Rule 4:5-1, I certify that the matter in controversy is not the subject of any other action pending in any court, or of a pending arbitration proceeding, that no other action or arbitration proceeding is contemplated, and that I am not aware of any non-party who should be joined in this action pursuant to R. 4:28 or who is subject to joiner pursuant to R. 4:29-1 (b) because of potential liability to any party on the basis of the same facts.

I further certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false that I am subject to punishment.

SZAFERMAN, LAKIND,
BLUMSTEIN & BLADER , P.C.
Attorneys for Plaintiff

By: _____
Robert E. Lytle, Esq.

Dated: May __/__, 2014

LEVY KONIGSBERG, LLP
Attorneys for Plaintiff

By: _____
Moshe Maimon, Esq.

Dated: May __/__, 2014

Appendix XII-B1

| CIVIL CASE INFORMATION STATEMENT (CIS) <br><br> Use for initial Law Division <br> Civil Part pleadings (not motions) under *Rule* 4:5-1 <br> **Pleading will be rejected for filing, under *Rule* 1:5-6(c), if information above the black bar is not completed or attorney's signature is not affixed** | FOR USE BY CLERK'S OFFICE ONLY <br> PAYMENT TYPE: ☐CK ☐CG ☐CA <br> CHCK NO RECEIVED & FILED <br> AMOUNT 2011 MAY -2 A 11: 37 <br> OVERPAYMENT MASS TORT CIVIL DIV <br> MIDDLESEX VICINAGE <br> BATCH NUMBER: |
|---|---|

| ATTORNEY / PRO SE NAME <br> Robert E. Lytle (ID # 046331990) | TELEPHONE NUMBER <br> (609) 275-0400 | COUNTY OF VENUE <br> Middlesex |
|---|---|---|
| FIRM NAME (if applicable) <br> Szaferman, Lakind, Blumstein & Blader, P.C. | | DOCKET NUMBER (when available) <br> MID-L- 2641 -14AS |
| OFFICE ADDRESS <br> 101 Grovers Mill Road, Suite 200 <br> Lawrenceville, NJ 08648 | | DOCUMENT TYPE <br> Complaint |
| | | JURY DEMAND  ☒ YES  ☐ NO |

| NAME OF PARTY (e.g., John Doe, Plaintiff) <br> Harold Brown, Plaintiff | CAPTION <br> Harold Brown v. Caterpillar, Inc., et al. |
|---|---|

| CASE TYPE NUMBER <br> (See reverse side for listing) <br> 601 | HURRICANE SANDY RELATED? <br> ☐ YES  ☒ NO | IS THIS A PROFESSIONAL MALPRACTICE CASE?  ☐ YES  ☒ NO <br> IF YOU HAVE CHECKED "YES," SEE *N.J.S.A.* 2A:53 A -27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |
|---|---|---|
| RELATED CASES PENDING? <br> ☐ YES  ☒ No | IF YES, LIST DOCKET NUMBERS | |
| DO YOU ANTICIPATE ADDING ANY PARTIES <br> (arising out of same transaction or occurrence)? <br> ☐ YES  ☒ No | NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY (if known)  ☐ NONE  ☒ UNKNOWN | |

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP? <br> ☐ YES  ☒ No | IF YES, IS THAT RELATIONSHIP: <br> ☐ EMPLOYER/EMPLOYEE  ☐ FRIEND/NEIGHBOR  ☐ OTHER (explain) <br> ☐ FAMILIAL  ☐ BUSINESS |
|---|---|

| DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?  ☐ YES  ☒ No |
|---|

USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION

| DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS? <br> ☐ YES  ☒ No | IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION |
|---|---|
| WILL AN INTERPRETER BE NEEDED? <br> ☐ YES  ☒ No | IF YES, FOR WHAT LANGUAGE? |

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b).

ATTORNEY SIGNATURE:

**Side 2**

# CIVIL CASE INFORMATION STATEMENT
## (CIS)
Use for initial pleadings (not motions) under *Rule* 4:5-1

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I - 150 days' discovery**
- 151 NAME CHANGE
- 175 FORFEITURE
- 302 TENANCY
- 399 REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction)
- 502 BOOK ACCOUNT (debt collection matters only)
- 505 OTHER INSURANCE CLAIM (including declaratory judgment actions)
- 506 PIP COVERAGE
- 510 UM or UIM CLAIM (coverage issues only)
- 511 ACTION ON NEGOTIABLE INSTRUMENT
- 512 LEMON LAW
- 801 SUMMARY ACTION
- 802 OPEN PUBLIC RECORDS ACT (summary action)
- 999 OTHER (briefly describe nature of action)

**Track II - 300 days' discovery**
- 305 CONSTRUCTION
- 509 EMPLOYMENT (other than CEPA or LAD)
- 599 CONTRACT/COMMERCIAL TRANSACTION
- 603N AUTO NEGLIGENCE – PERSONAL INJURY (non-verbal threshold)
- 603Y AUTO NEGLIGENCE – PERSONAL INJURY (verbal threshold)
- 605 PERSONAL INJURY
- 610 AUTO NEGLIGENCE – PROPERTY DAMAGE
- 621 UM or UIM CLAIM (includes bodily injury)
- 699 TORT – OTHER

**Track III - 450 days' discovery**
- 005 CIVIL RIGHTS
- 301 CONDEMNATION
- 602 ASSAULT AND BATTERY
- 604 MEDICAL MALPRACTICE
- 606 PRODUCT LIABILITY
- 607 PROFESSIONAL MALPRACTICE
- 608 TOXIC TORT
- 609 DEFAMATION
- 616 WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES
- 617 INVERSE CONDEMNATION
- 618 LAW AGAINST DISCRIMINATION (LAD) CASES

**Track IV - Active Case Management by Individual Judge / 450 days' discovery**
- 156 ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION
- 303 MT. LAUREL
- 508 COMPLEX COMMERCIAL
- 513 COMPLEX CONSTRUCTION
- 514 INSURANCE FRAUD
- 620 FALSE CLAIMS ACT
- 701 ACTIONS IN LIEU OF PREROGATIVE WRITS

**Multicounty Litigation (Track IV)**

| | | | |
|---|---|---|---|
| 266 | HORMONE REPLACEMENT THERAPY (HRT) | 288 | PRUDENTIAL TORT LITIGATION |
| 271 | ACCUTANE/ISOTRETINOIN | 289 | REGLAN |
| 274 | RISPERDAL/SEROQUEL/ZYPREXA | 290 | POMPTON LAKES ENVIRONMENTAL LITIGATION |
| 278 | ZOMETA/AREDIA | 291 | PELVIC MESH/GYNECARE |
| 279 | GADOLINIUM | 292 | PELVIC MESH/BARD |
| 281 | BRISTOL-MYERS SQUIBB ENVIRONMENTAL | 293 | DEPUY ASR HIP IMPLANT LITIGATION |
| 282 | FOSAMAX | 295 | ALLODERM REGENERATIVE TISSUE MATRIX |
| 284 | NUVARING | 296 | STRYKER REJUVENATE/ABG II MODULAR  HIP STEM COMPONENTS |
| 285 | STRYKER TRIDENT HIP IMPLANTS | 297 | MIRENA CONTRACEPTIVE DEVICE |
| 286 | LEVAQUIN | 601 | ASBESTOS |
| 287 | YAZ/YASMIN/OCELLA | 623 | PROPECIA |

If you believe this case requires a track other than that provided above, please indicate the reason on Side 1,
In the space under "Case Characteristics.

**Please check off each applicable category**    ☐ **Putative Class Action**    ☐ **Title 59**

Szaferman, Lakind,
  Blumstein & Blader, P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, N.J. 08648
(609) 275-0400

Levy Konigsberg, LLP
101 Grovers Mill Road, Suite 200
Lawrenceville, N.J. 08648
(609) 720-0400

Attorneys for Plaintiff
Robert E. Lytle (NJ ID No. 046331990)

| | |
|---|---|
| HAROLD BROWN,<br><br>           Plaintiff,<br><br>        v.<br><br>CATERPILLAR INC., et al.,<br><br>           Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION, MIDDLESEX COUNTY<br><br>DOCKET NO.: MID-L-2641  -14AS<br><br><br>**Civil Action - Asbestos<br>Litigation**<br><br><br>INITIAL FACT SHEET |

| | | |
|---|---|---|
| 1. | Full Name: | Harold Brown |
| 2. | Date of Birth: | October 12, 1926 |
| 3. | Address: | 2334 Pigeon Roost Road<br>Pulaski, TN 38478 |
| 4. | Union/Local/Years of Membership: | n/a |
| 5. | Date of first claimed asbestos exposure: | Approximately 1947 |
| 6. | Date of last claimed asbestos exposure: | Approximately 1978 |
| 7. | Smoking History: | Yes |
| 8. | State the inclusive dates of smoking history, the products smoked and the amount of product consumed per day: | |
| | a.   Dates: | Approximately 1944-1950 (cigarettes); 1950-1994 (cigars) |

| b. | Products smoked: | Cigarettes from 1944-1950 (Brand cigarettes to be provided); Cigars from 1950-1994 (Brand Cigars to be provided) |
|---|---|---|
| c. | Amount per day: | Plaintiff smoked cigarettes infrequently; information on cigars is to be provided. |

9.  Provide as much of the following information as is presently available: work sites, inclusive dates and trade or occupation for each site:

| WORK SITES: | DATES: | TRADE/OCCUPATION |
|---|---|---|
| Thuls Auto Parts Plainfield, NJ | 1947-1964 | Heavy Equipment Mechanic |
| Machinery Maintenance Greenbrook, NJ | 1964-1968 | Heavy Equipment Mechanic |
| DNS Construction South Plainfield, NJ | 1968-1973 | Heavy Equipment Mechanic |
| New Jersey | Approximately 1947-1973 | Farm Equipment Maintenance |

10. State the claimed asbestos related diseases; include the date of diagnosis and the name of the diagnosing physician or institution (if available attached a copy of the medical report).

| a. | Disease: | Malignant Pleural Mesothelioma |
|---|---|---|
| b. | Date of Diagnosis: | May 3, 2012 |
| c. | Doctor/ Institution: | St. Thomas Hospital 4220 Harding Road Nashville, TN 37202 |

SZAFERMAN, LAKIND,
  BLUMSTEIN & BLADER, P.C.
Attorneys for Plaintiffs

*Robert E. Lytle*

Robert E. Lytle, Esq.

Dated: May \_\_, 2014

# Exhibit B

Page 1

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: MIDDLESEX COUNTY
DOCKET NO. MID-L-2518-14AS
-------------------------------------------

)
VLADIMIR "DANNY" DANYSH, JR.                 )
)
                              Plaintiff,     )
)
              -against-                      )
)
ANORA HOLDINGS A.G., et al.,                 )
)
                              Defendants.    )
)
-------------------------------------------  )
)

VIDEOTAPED DEPOSITION UNDER ORAL EXAMINATION OF

VLADIMIR "DANNY" DANYSH, JR.

MORRISTOWN, NEW JERSEY

MAY 22, 2014

- - - -

REPORTED BY:  JILL PRAML-BUSSANICH, CCR

- - - -

PRIORITY-ONE/VERITEXT
290 WEST MT. PLEASANT AVENUE, SUITE 2260
LIVINGSTON, NEW JERSEY 07039
(718) 983-1234

Page 205

manufacturer or the make of the brakes that were on the car when you got it?

A.   No.

Q.   It was a very old car at that point?

A.   1940 Ford Coupe.

Q.   In terms of the replacement brakes that you changed, what were the brand name of the brakes?

A.   I couldn't recall, but a -- usually from Pep Boys.

We had the main auto supplies, Pep Boys, R & S Strauss and Thuls.

And you walked in, you asked for brakes for a certain car -- at Thuls it was, more or less, an automatic -- what they call authorized equipment, genuine equipment, for a vehicle.

If it required a certain thing, that's what they gave you.

Q.   You associate that with Thuls?

A.   That was Thuls.

Q.   R & S Strauss, is there a particular brand you associate with getting at Strauss?

A.   They had every brand and they had their own store brand.

They had the same thing, the Bendix, you

Page 206

name them.  It was a Raybestos or -- Raybestos.

Q.  How about Pep Boys, are there particular brands that you associate with Pep Boys?

A.  Bendix, Raybestos and house brand.

You had to specify what you were buying and what you wanted, what they called remanufactured, okay, original or remanufactured.

Q.  Let me throw in a third term just so that we're all clear.

There is original, which I associate with the vehicle manufacturer's part.

A.  Right.

Q.  And then there is something called aftermarket.

A.  Aftermarket.

Q.  And that's things like, for instance, Bendix, right?

A.  Right.

Q.  But then there is another category that I call remanufactured.

A.  Right.

Most of our stuff was aftermarket.

Q.  Okay.

A.  Unless you went to the dealer itself. You went to the Ford dealer, you got a Ford product.

Page 209

And I used that car.  It was like new.

Q.   And in terms of the brakes that you're talking about, did you do a set of fronts or rears?

A.   Fronts and backs.

Q.   Fronts and backs?

A.   Yes.  At that time nothing was brake shoes.

Q.   Do you -- when we say --

A.   Also wheel cylinders in the front.  I remember that.

Q.   When we say brake shoes, we're talking about drum brakes?

A.   Yes.  All drum brakes.

Q.   In terms of the specifics of that brake job, do you remember anything about, for instance, where you purchased the replacement brakes?

A.   At Thuls Auto Supply.

Q.   You mentioned --

A.   Thuls was good.  You want to know why? Because if you were short, you needed something, he gave you credit until you got the money to pay him back.

Department stores, the R & S Strauss, Pep Boys wouldn't do that for you.

Page 234

I know it was at least once.

Everything you bought used, you know, nobody takes the wheels off and says let me do this for you.  You have to do it yourself.

Q.  Do you recall specifically where you would have purchased the replacement parts for the Buick Wildcat?

A.  It was either Thuls or Pep Boys.  They were the main at the time.

R & S Strauss was having problems at the time with getting parts.  You order something and they wouldn't order it for you.

The son took over the father's business and ran it into the ground.

Q.  Do you have a memory, whether or not you purchased it at Thuls or Pep Boys, do you remember the brand of the brakes that you bought?

A.  No.  If it was at Thuls, they gave you usually original equipment or Bendix.  Bendix pushed a lot.  They were great.

Q.  In terms of all the other work that you did on that car, you mentioned exhaust?

A.  Exhaust.

Q.  Do you believe any parts that you did in the exhaust system contained asbestos?

Page 238

A.    I was working at the time with the gutters and stuff.  I was using both trucks, using one for carrying supplies and one to travel back and forth.

Q.    There is a period of time you had two Ford vans?

A.    Right.

Q.    In terms of the '69 Ford van, do you recall changing brakes on that?

A.    Yes.  When I first bought it.

Q.    One brake change?

A.    Yes.

Q.    Where did you buy the brakes --

A.    Either Thuls or Pep Boys.

Q.    Do you recall?

A.    We stopped doing business with R & S because they started going under.

Q.    Do you recall a particular brand that you recall for doing that brake job?

A.    That would be impossible to remember.  But they featured house brand.  And if you wanted original equipment, you went to Ford for their linings.

But Thuls, like I said, specialized and checked out all the Bendix.

Page 327

REPORTER'S CERTIFICATE


I, JILL A. PRAML-BUSSANICH, CCR No.

XI01807, Certified Court Reporter, certify:

That the foregoing proceedings were taken

before me at the time and place therein set forth,

at which time the witness was put under oath by me;

That the testimony of the witness and all

objections made at the time of the examination were

recorded stenographically by me and were thereafter

transcribed;

That the aforegoing is a true and correct

transcript of my shorthand notes so taken.

I further certify that I am not a relative

or employee of any attorney or of any of the

parties, nor financially interested in the action.

I declare under penalty of perjury under

the laws of New Jersey that the foregoing is true

and correct.

Dated this 13th day of June, 2014.


_____

JILL A. PRAML-BUSSANICH,

CCR NO. XI01807

# Exhibit C

PLAINTIFF'S
EXHIBIT
MAC-30

SUPREME COURT OF THE STATE OF NEW YORK
SEVENTH JUDICIAL DISTRICT

In Re: Seventh Judicial District
Asbestos Litigation

SEVENTH JUDICIAL DISTRICT
ASBESTOS LITIGATION

This Document Applies to:

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ONTARIO

ANNE M. TINKER, Executrix of the
Estate of TIMOTHY W. TINKER, Deceased,
and Individually as the Surviving
Spouse of TIMOTHY W. TINKER,

Plaintiff,

CASE NO. 83778

vs.

A.E. CLEVITE, INC.,;
et al.,

Defendants

### DEFENDANT, MACK TRUCKS, INC.'S VERIFIED RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES ENTITLED "VEHICLE AND ENGINE INTERROGATORIES/ PRODUCT DEFENDANTS"

Defendant, MACK TRUCKS, INC. ("Mack Trucks"), serves this response to

Plaintiff's Second Set of Interrogatories.

### INTRODUCTION AND GENERAL RESPONSE

Responses provided herein have been prepared pursuant to a reasonable and

duly diligent investigation and search for the information requested.  In conducting its

business, Mack Trucks has each year created thousands of documents that have been

kept in numerous locations and have been moved as the organization changed and as

employees changed jobs.  Accordingly, Mack Trucks cannot represent that the responses contained herein provide all information requested; rather, these responses reflect information obtained before this date by Mack Trucks pursuant to a reasonable and duly diligent search and investigation in those areas where responsive information was expected to be found.  To the extent that the request purports to require more, Mack Trucks objects on grounds that include that compliance with the request would impose an undue burden and expense.

These answers are intended to be accurate to the best of Mack Truck's knowledge and belief as of the time of the service of this answer. To the extent that they are not inconsistent with any previous answers made in other cases, these answers are intended to supersede such earlier answers. Mack Trucks reserves the right to supplement these answers should it discover new information.

You have served Mack Trucks with discovery and yet you already may have some pertinent information or documents, perhaps even some information or documents not received from Mack Trucks. Mack Trucks objects on the grounds that it would be less burdensome, more convenient and less expensive for you to identify what information or documents you already have that fall within the scope of these requests. This would accomplish several purposes: (a) it would obviate Mack Trucks having to search for information already in your possession; (b) it would enable Mack Trucks to use any documents or other information provided by you as guides in looking for related material; and it would, if your purposes were to obtain authentication of particular documents, enable Mack Trucks to authenticate the copies provided by you

2

without having to conduct an uninformed search for those documents in Mack Trucks' files.

Mack Trucks further objects to these interrogatories where the matters inquired of are neither relevant to the subject matter involved in the pending action nor reasonably calculated to lead to the discovery of admissible evidence.

The Plaintiff has sued Mack Trucks, Inc. individually as well as successor to Brockway Inc. Mack Trucks is not a successor to Brockway, Inc. Rather, Brockway Motor Trucks, a division of Mack Trucks is a successor to the Brockway Motor Trucks Co. Brockway Motor Trucks, a division of Mack Trucks, Inc. ceased doing business in 1977. Accordingly, the answers herein pertain to Mack Trucks individually only. Since Brockway Motor Trucks, a division of Mack Trucks ceased doing business in 1977, business records of that entity which are still available for inspection are stored in Hagerstown, Maryland. It is unknown whether such records would reveal information responsive to these interrogatories. As the burden of deriving or ascertaining the answers to these interrogatories from a review of such records is substantially the same for plaintiffs as it is for Mack Trucks, Mack Trucks will make these documents available for review by Plaintiff. In accord with the applicable rules of civil procedure, Mack Trucks will provide assistance to the Plaintiff in locating and identifying the records at the time of inspection.

3

## DEFINITIONS

As used in Mack Trucks' objections to these requests:

(I)    "Lack of Relevance" means that a request calls for information which is not relevant to the subject matter of this action and is not reasonably calculated to lead to the discovery of admissible evidence;

(ii)   "Unduly Burdensome" means that it would be oppressive, time consuming or expensive to require Mack to compile and furnish the information in light of the degree of its relevance and materiality, if any;

(iii)  "Overly broad" means that such request is overly broad as to scope, time or location;

(iv)   "Lack of Particularity" means that a request does not state with reasonable particularity the information to be furnished, is vague and ambiguous or incomprehensible;

(v)    "Improper Assumption" means that a request assumes facts which are not true or accurate;

(vi)   "Improper Opinion" means that a request improperly calls for an opinion, conclusion, contention or inference;

(vii)  "Privileged" means a request calls for information protected by the attorney/client privilege or the work-product doctrine or the rule protecting materials prepared in anticipation of or in connection with litigation; and

4

(viii)    "Premature" means that a request calls for opinion or contention that relates to fact or the application of law to fact and should not properly be required to be responded to at this time.

These comments and objections are incorporated into each Mack response set forth below as if they were set forth in their entirety as they apply to each response. Responses made after objections are not waivers of objections.

## RESPONSES

### 1.    DATA SOURCES

A.    Identify each person with whom you consulted or who provided information used in answering these Interrogatories and specify the Interrogatory for which information was given.

B.    Identify each person's:

(1)    Address;
(2)    Position with the Defendant.

**RESPONSE:**

Objections: Lack of relevance; privileged. The manner in which Mack Trucks' attorneys assemble information pertaining to pending litigation is protected by the attorney/client privilege and work product doctrine. Without waiving these objections, Mack Trucks states that the responses to these Interrogatories were prepared by consulting, directly or indirectly with thousands of documents prepared by perhaps hundreds of individuals. The responses to these Interrogatories constitute a corporate response which has been verified by an authorized agent of Mack Trucks. The person signing these Interrogatories is an employee of Mack Trucks who is an authorized agent for the purpose of verifying discovery responses. For that person's name, please

5

refer to the Verification page. Mack Trucks requests that any contact be through its

counsel.

### 2.   PURCHASE OF ASBESTOS COMPONENT PARTS

List the name, principal place of business of every manufacturer or remanufacturer, and years from whom you purchased the following asbestos-containing component parts for any of your vehicles (except automobiles) or engines during the years 1970 - 1980.

A.   any clutch products, including but not limited to clutches, clutch assemblies and clutch facings

B.   any brake products, including, but not limited to brake shoes and brake linings, brake assemblies, or brake pads

C.   gaskets

### RESPONSE:

Objections: Lack of relevance; burden; overly broad, lack of particularity; premature. Without waiving its objections, Mack Trucks states that it sold trucks with brake lining, clutch facing and gasket components which at times contained encapsulated chrysotile asbestos until asbestos was phased out of such components by Mack's suppliers as suitable alternatives became available in the 1970's and 1980's. Throughout the 1970's, Mack purchased non-asbestos containing gaskets for use in its engines where suitable for the application.   In 1979, Mack Trucks began installing the first available brake assemblies containing non-asbestos brake linings suitable for use in its trucks.

6

Mack Trucks purchased brake-lining products which are believed to have contained encapsulated chrysotile asbestos from the following manufacturers during the years 1970 - 1980:

Abex/American Brake Blok
Friction Production Division
Suite 710
3001 West Big Beaver Road
Troy, MI  48084

H.K. Porter Company, Inc./Thermoid
Trenton 6, NJ

Johns-Manville
Sales Corporation
Industrial Products Division
270 Madison Avenue
New York 16, NY

Raybestos-Manhattan, Inc.
Equipment Sales Division
Stratford, Connecticut

Raybestos-Manhattan, Inc.
Bridgeport, Connecticut

Rockwell
Highway Brake Division
424 Leh Street
Allentown, PA  18104

Mack Trucks purchased gaskets which are believed to have contained encapsulated chrysotile asbestos from the following manufacturers during the years 1970 - 1980:

Armstrong Cork Company
Executive Mall Building #6
676 Swedesford Road
Wayne, PA  19087

7

Detroit Gasket & Manufacturing Company
21800 Greenfield Road
Detroit, MI  48237

Fel-Pro, Inc.
7450 North McCormick Blvd.
Skokie, IL  60076

Hollinsworth & Vose

Vellumoid Division of Federal-Mogul Corporation
54 Rockdale Street
Worcester, Massachusetts  01606

Victor Manufacturing & Gasket Company
5750 West Roosevelt Road
Chicago, IL  60650

Victor Products Division
Dana Corporation
19111 West Ten Mile Road
Suite 213
Southfield, MI  48075

Victor Products Division
Dana Corporation
Post Office Box 462
1945 Ohio Street
Lisle, IL  60532

Mack Trucks states that its investigation is ongoing to determine its particular suppliers of clutch products which may have contained encapsulated chrysotile asbestos during the years 1970 - 1980 and that this answer will be supplemented. However, Mack states that the following have sold clutch products to Mack Trucks in the past:

Asbestos Manufacturing Company
Huntington, Indiana

8

Asbestos Manufacturing Company
4-251 General Motors Building
Detroit, MI

Asbestos Manufacturing Company
40 West 40th Street)
New York, NY

Borg & Beck
Division of Borg-Warner Corporation
655(8) South Henard Avenue
Chicago 38, IL

Johns-Manville
Sales Corporation
Industrial Products Division
270 Madison Avenue
New York 16, NY

Lipe Clutch
7600 Morgan Road
Liverpool, NY  13088

Raybestos-Manhattan, Inc.
Equipment Sales Division
Stratford, Connecticut

Raybestos-Manhattan, Inc.
Bridgeport, Connecticut

The Russell Manufacturing Co.
1119 East Bronson Street
South Bend, Indian

Spicer/Dana
Ft. Wayne, Indiana

Thermoid Company (Division of H.K. Porter Co.)
Trenton 6, NJ

9

### 3. MANUFACTURE OF ASBESTOS COMPONENT PARTS

State whether and what years Defendant manufactured or remanufactured any of the following asbestos-containing parts for any of your vehicles (except automobiles) or engines during the years 1970 - 1980.

A.  any clutch products, including but not limited to clutches, clutch assemblies and clutch facings

B.  any brake products, including, but not limited to brake shoes and brake linings, brake assemblies, or brake pads

C.  gaskets

**RESPONSE:**

Mack Trucks did not manufacture or remanufacture any clutch, brake or gasket

products during the years 1970 - 1980.

### 4. SALE OF ASBESTOS COMPONENT PARTS

State whether Defendant sold any of the asbestos-containing component parts during the years 1970 - 1980 listed in Interrogatory No. 2, either directly or through any of your agents or independent dealers.

If so, state: (1) which component parts you or your agents or independent dealers sold, (2) state the years these component parts were sold, and (3) the trade name(s) under which the component parts were sold.

**RESPONSE:**

Objections: Lack of relevance; burden; overly broad; lack of particularity; premature. Without waiving these objections, Mack Trucks states that Mack Trucks did not manufacture brake, clutch or gasket products that were used in the assembly of new trucks or which were sold for use as replacement parts. Replacement or "after-market" brake, clutch and gasket products were purchased by Mack Trucks from its suppliers of such components. They were then distributed to its sales branches or sold

10

to independent dealers, who are not agents or employees of Mack, who would then sell them to the customer. Upon all information currently available to Mack Trucks, replacement brake and clutch products manufactured by others were sold in the packaging of the manufacturer and were sold under the manufacturers' trade name, with a label bearing a Mack Part No., or were sold in a brown or white box with a similar label depending on the manufacturer and the specific time frame. For a list of Mack's suppliers of brake and clutch products, see Mack Truck's answer to Interrogatory No. 2.

Depending on the design of the truck for which a replacement brake part was being sold, as well as the specific time frame, replacement brake products may not have contained asbestos at all or may have contained encapsulated chrysotile asbestos. Non-asbestos containing brake products manufactured by others and sold to Mack Trucks, were available beginning in 1979 for some applications.

As for replacement gasket products sold in the period 1970-1980, many gaskets sold for use in Mack Truck engines did not contain asbestos at all depending on the engine and the application of the gasket product while others contained encapsulated chrysotile asbestos. Replacement gaskets were repackaged by Mack Trucks and sold under its own trade name.

## 5. MANUFACTURE OF VEHICLES/ENGINES CONTAINING ASBESTOS COMPONENT PARTS

Has Defendant engaged from 1970 through 1980 in the manufacture or remanufacture of any vehicle (except automobiles) or engine containing any of the asbestos component parts listed in Interrogatory No. 2? If so, state:

11

A.    Which asbestos-containing part;

B.    The amount of asbestos (%) and fiber type;

C.    The years during which such activity took place;

D.    If such activity was terminated, the reason why.

RESPONSE:

Objections:  Lack of relevance; burden; overly broad; lack of particularity; premature.  Without waiving these objections, Mack Trucks states that during the years 1970 through 1980, Mack Trucks engaged in the manufacture and sale of trucks and truck engines.  Mack trucks and truck engines included brake, clutch, or gasket components.  Such components may not have contained asbestos or may have contained encapsulated chrysotile asbestos depending on the design of the particular truck or truck engine and the specific model year.

During the period of 1970 through 1980, some gasket products used in the manufacture of Mack trucks and truck engines did not contain any asbestos at all and some contained encapsulated chrysotile asbestos depending on the gasket's application.

Beginning in 1979, Mack's suppliers of brake products began to offer non-asbestos brake products for some applications and such products were installed by Mack in its manufacture of trucks.

Based on available information, Mack Trucks understands that the percentage of encapsulated chrysotile asbestos in a new brake lining can vary. It does not know the specific percentage of encapsulated chrysotile asbestos used in the particular brake

12

products it was supplied in the 1970-1980 time frame. Typically, brake products contained approximately 40% chrysotile asbestos however, the percentage of chrysotile asbestos contained in brake dust that could possibly be inhaled by a mechanic is 0.1% and only 0.1% of that 0.1% of asbestos consists of fiber which is greater than 5 microns in length. According to the Occupational Safety and Health Administration, asbestos fibers less than five microns in length do not pose an occupational hazard. Mack Trucks does not know the specific percentage of encapsulated chrysotile asbestos used in the particular clutch products it was supplied in the 1970-1980 time frame. However, since clutch facings go through the same heat breakdown process as brakes do as a result of friction that is applied in the normal use of a truck, it is understood that any dust from clutches which contains asbestos would be in the same minimal amount.

Based upon available information, Mack Trucks understands that asbestos-containing brake and clutch products generally were made with pure chrysotile asbestos. Prior to the friction process discussed above, chrysotile asbestos fibers in brake and clutch products are encapsulated with binders and resins such that they cannot be inhaled by the user.

Mack Trucks also understands, based upon available information, that asbestos-containing gaskets were made with pure chrysotile asbestos that was encapsulated in binders and resins and therefore, could not be inhaled by a user. Mack Trucks does not know the specific percentage of encapsulated chrysotile asbestos used in the particular gaskets it was supplied in the 1970-1980 time frame. However, if a gasket

13

was being removed from an engine, even with a grinder, the amount of asbestos fibers greater than 5 microns in length which could be released and therefore respirable was very minimal. Studies have shown that such levels are far below 0.1 fibers per cubic centimeter, which is the current permissible exposure limit for an eight-hour work day. Removal of a gasket with a putty knife would result in even less exposure.

### 6. SALE OF VEHICLES/ENGINES CONTAINING ASBESTOS COMPONENT PARTS

Has Defendant engaged from 1970 through 1980 in the sale of any vehicles (except automobiles) or engines containing any of the asbestos component parts listed in Interrogatory No. 2? If so, state:

A.    Which asbestos-containing part;

B.    The amount of asbestos (%) and fiber type;

C.    The date such activity began;

D.    The date when such activity was terminated.

**RESPONSE:**

See Response to Interrogatory No. 5.

### 7. RELABELING OF ASBESTOS COMPONENT PARTS

Had Defendant from 1970 through 1980 engaged in the relabelling or rebranding of any of the asbestos component parts listed in Interrogatory No. 2 manufactured in whole or in party by an unrelated business entity? If so, state:

A.    Which asbestos-containing part;

B.    The name of the unrelated business entity which manufactured the component part;

C.    The component part's original trade and/or brand name;

14

D.   Who performed the physical relabelling or rebranding and where it was accomplished;

E.   The years during which such activity took place;

F.   The brand name and/or trade name after the product was rebranded;

G.   The amount of asbestos (%) and fiber type;

H.   Whether the rebranded or relabelled parts were ever placed in any of the Defendant's vehicles or engines.

RESPONSE:

Objections:   Lack of relevance; burden; overly broad; lack of particularity; premature. Without waiving these objections, Mack Trucks states that based upon all information available, Mack Trucks did not rebrand or relabel any brake, clutch or gasket product used in the assembly of any of its trucks or truck engines. The suppliers of gaskets would ink-stamp the word "Mack" and the Mack Part No. on gaskets in addition to stamping their own identifying name or symbol. Suppliers of brake products would stamp or stencil the Mack Part No. in addition to stamping or stenciling their own identifying name or symbol.

Products to be sold in the after-market were purchased by Mack Trucks from the manufacturers of these components and were then distributed to its sales branches or sold to independent dealers, who are not agents or employees of Mack, who would then sell them to their customers. Upon all information available to Mack Trucks, in the 1970-1980 time period, replacement brake and clutch products manufactured by others remained in the original packaging of the manufacturer and

15

were sold under the manufacturer's trade name with a label bearing a Mack Part No. or were sold in a brown or white box with a similar label depending on the manufacturer and the specific time frame. More specific information is not available.

As for replacement gaskets sold in the 1970-1980 time period, Mack would purchase gaskets from its suppliers and repackage them in bags which would then be distributed to its sales branches or independent dealers. The repackaging may have been done in-house or by a packaging vendor. The bag would bear the trade name Mack Trucks Inc.

For a list of Mack Truck's suppliers of replacement brake, clutch and gasket products, please see Mack's response to Interrogatory No. 2.

Mack Trucks understands that asbestos-containing brake products contained pure encapsulated chrysotile asbestos. Beginning in 1979, certain brake lining products became available for sale to and were purchased by Mack Trucks which did not contain any asbestos at all. The percentage of asbestos used in brake products for which a non-asbestos containing brake product was not available is discussed in Mack Trucks' answer to Interrogatory No. 5.

Mack Trucks also understands that asbestos-containing gaskets contained pure chrysotile asbestos. Throughout the period 1970-1980, many non-asbestos containing gaskets were purchased from suppliers when suitable for the application of the particular gasket. For other applications, non-asbestos containing gaskets were not available from suppliers. As for the amount of asbestos in such gaskets, please see Mack Truck's answer to interrogatory No. 5.

16

8.   **TESTING**

Were any tests conducted on any asbestos-containing component parts identified in Interrogatory No. 2, 3, 4, 5, 6 or 7 to determine:

A.   The identify(sp) of each individual or firm who conducted such tests;

B.   The date, purpose, and result of each such test;

C.   Identify and produce all documents relating to such tests.

**RESPONSE:**

Objections:   Lack of relevance; burden; overly broad; lack of particularity. Without waiving these objections, Mack Trucks states that if the interrogatory is seeking information concerning whether Mack Trucks conducted its own testing of potential asbestos fiber release from brake, clutch, or gasket products, Mack Trucks states that after diligent search, it has not located a record of any such test.

9.   **WARNING/DESCRIPTION**

For each of the component parts listed in Interrogatory No. 2 which contained asbestos and which were placed in your vehicles (except automobiles) or engines during the period between 1970-80, state whether you placed any caution, warning or hazard statement or explanation involving asbestos on either the component part, the vehicle or engine in which the component part was placed.

If so, provide as to each component part the following information as to the caution, warning or hazard statement:

A.   Its precise wording;

B.   Where was it located on the product, packaging, and what was the size and color of the lettering;

C.   Has the wording or its presentation ever been altered, and if so, how and when;

17

D.   The years during which each version of a caution, warning or hazard statement appeared on each component part;

E.   Identify all documents relating to the warning.

**RESPONSE:**

Objections: Burden; overly broad; lack of particularity; improper assumption; premature. Without waiving these objections, Mack Trucks understands that as for brake products, at least some of Mack Trucks' suppliers may have provided warnings on their products during the 1970-1980 time period. The precise wording of the warning statements and the other details requested in this interrogatory are unknown. Such warning statements would not have been altered by Mack Trucks. Mack Trucks does not possess any documents relating to this interrogatory. It is unknown whether warning or cautionary statements were placed on clutch products.

As for gaskets, this interrogatory improperly assumes there were health hazards associated with the use of engine gaskets which would require a warning or statement concerning asbestos. OSHA has determined that even when broken or damaged, gaskets do not release significant amounts of asbestos fibers because they are encapsulated in binders and resins. Accordingly, OSHA exempted from its labeling requirements a duty to provide a warning label with gaskets and Mack Trucks did not provide such a label.

10.   **WARNING/INSERT**

If you sold or resold any of the component parts listed in Interrogatory No. 2 which contained asbestos, either directly or through any of your independent dealers, did you ever place any form of package insert or

18

informative brochure in the container accompanying the component part explaining the hazards of asbestos?

If so, state as to each such insert or brochure:

A. When was it first placed in containers and for what years thereafter;

B. What products had the insert or brochure included;

C. Provide a verbatim statement of the insert;

D. Identify all documents relating to the warning.

**RESPONSE:**

Objections: Burden; overly broad; lack of particularity; improper assumption; premature. Without waiving these objections, Mack Trucks states that as for brake products, at least some of Mack Trucks' suppliers provided warning labels or inserts on or with their products during the 1970-1980 time period. The precise wording of the warning statements is unknown but it is understood that the recommended OSHA language was commonly used. It is unknown whether such statements were placed on or with clutch products.

As for gaskets that were repackaged by Mack Trucks, no insert or statement was provided with such gaskets and this interrogatory improperly assumes there were health hazards associated with the use of engine gaskets which would require an insert or statement concerning asbestos. OSHA has determined that even when broken or damaged, gaskets do not release significant amounts of asbestos fibers because they are encapsulated with binders and resins. Accordingly, OSHA exempted from its labeling requirements a duty to provide a warning label with gaskets.

19

## 11. WARNING/MASK

If you sold or manufactured any asbestos containing component parts listed in Interrogatory No. 4 and/or 5, did you ever place any form of disposable face mask or respirator in a container for later use by persons who would handle and/or be exposed to such parts? If so, please state:

A.    The parts covered by the practice;

B.    The year this practice began and the years it was implemented;

C.    Described the type of face mask or respirator included in the container.

### RESPONSE:

Objections: Lack of relevance; burden; overly broad, lack of particularity, improper assumption; premature. Without waiving these objections, Mack Trucks states that given what is known about the very minimal amount of potential asbestos exposure posed by working with brake, clutch and gasket products, Mack Trucks states that it has no information that such products were packaged with a face mask.

Dated:    Orlando, Florida ,
          March 13, 1997

CHRIS N. KOLOS, ESQUIRE
Florida Bar No.: 438235
MAGUIRE, VOORHIS & WELLS, P.A.
Two South Orange Plaza
2 South Orange Avenue
Post Office Box 633
Orlando, Florida 32802-0633
Phone: (407) 244-1100
Fax: (407) 423-8796

Attorneys for Defendant, MACK TRUCKS, INC.

TO:        See Attached Service List

20

## VERIFICATION

~~Commonwealth~~
~~STATE~~ OF Pennsylvania

COUNTY OF LEHIGH

Thomas F. Brown , being duly sworn on oath, deposes and states that he/she-is Sr. Sales Engineer for the Defendant, Mack Trucks, Inc.; that he/she signed Mack Trucks, Inc.'s Responses to Plaintiff's Second Set of Interrogatories on behalf of said Defendant, and is duly authorized to do so; that the matters stated in Mack Trucks, Inc.'s Responses to Plaintiff's Second Set of Interrogatories are not within the personal knowledge of deponent and that deponent is informed that there is no one officer or employee of Mack Trucks, who has personal knowledge of all such matters; the facts stated in Mack Trucks, Inc.'s Responses to Plaintiff's Second Set of Interrogatories have been assembled by authorized employees and counsel of said Defendant, and deponent is informed by those persons that the facts stated in the foregoing document are true; and that Mack Trucks, Inc. reserves the right to amend any of the foregoing answers if facts become known that make such amendment appropriate.

_____
**MACK TRUCKS, INC.**

SWORN TO AND SUBSCRIBED
before me this 12th day of
_March_ , 1997.

_____
Notary Public

My Commission Expires: Sept 1 1998

```
      NOTARIAL SEAL
HELEN JANE COOK, Notary Public
  Allentown, Lehigh County PA
My Commission Expires Sept. 7 1998
```

21

# Exhibit D

Szaferman, Lakind, Blumstein, & Blader P.C.
101 Grovers Mill Road, Suite 200
Lawrenceville, N.J. 08648
(609) 275-0400

Levy Konigsberg, LLP
101 Grovers Mill Road, Suite 105
Lawrenceville, N.J. 08648
(609) 720-0400

Attorneys for Plaintiff(s)

| | |
|---|---|
| HAROLD BROWN,<br><br>Plaintiff(s),<br><br>v.<br><br>CATERPILLAR, INC. et al.<br><br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION, MIDDLESEX COUNTY<br><br><br>DOCKET NO.: MID-L-2641-14AS<br><br>Civil Action<br>Asbestos Litigation<br><br>PLAINTIFFS' ANSWERS TO PART I<br>INTERROGATORIES, AND REQUEST<br>FOR PRODUCTION OF DOCUMENTS |

## INTERROGATORIES

I.1.    State your full name, address, and telephone number, date of birth, educational background, and social security number:

A.1.    a.    Harold Brown
b.    2334 Pigeon Roost Road, Pulaski, TN 38478
c.    (931) 424-5618
d.    10/12/1926
e.    High School
f.    ▬▬▬▬▬

I.2.    State the complete address of all places you have resided since birth giving the inclusive dates of residence for each place named and as to each state:
a.    fuel use for heating and cooking;
b.    significant home improvement (e.g., additions, reinstallation, re-wiring, etc.);
c.    number of family units co-occupying said structure.

{00338363.DOCX}

A.2.    At this time, Plaintiff is able to recall residing at the following:

I.        114 Pine Street, South Plainfield, New Jersey
          Approx from Birth - 1937

          a.        Heating: Coal
                    Cooking: Coal
          b.        none
          c.        Single Family Residence

II.       Watchung, New Jersey
          Approx. 1937-8/21/1944

          a.        Heating: Wood
                    Cooking: Electric
          b.        none
          c.        Single Family Residence

III.      Oklahoma City, OK CL91 (Military Service)
          Approx. 9/1944-6/24/1946

          a.        Heating: Electric, Turbine and Steam
                    Cooking: Electric, Turbine and Steam
          b.        none
          c.        Multiple people on vessel

IV.       Watchung, New Jersey
          Approx. 6/24/1946 – 1951

          a.        Heating: Wood
                    Cooking: Electric
          b.        none
          c.        Single Family Residence

V.        Irvington, New Jersey
          Approx. 1951-1956

          a.        Heating: Electric
                    Cooking: Electric
          b.        none
          c.        Two Family House

VI.       Greenbrook, New Jersey
          Approx. 1956-1981

          a.        Heating: Oil

{00338363.DOCX}

Cooking: Gas
b.    Roof replacement and bathroom remodel
c.    Single Family Residence

VII.    Miami, Florida
Approx. 1981 – 1991

a.    Heating: Electric
Cooking: Electric
b.    none
c.    Single Family Residence

VIII.    Pulaski, Tennessee
1991 – Present

a.    Heating: Propane
Cooking: Electric
b.    none
c.    Single Family Residence

I.3.    Are you married or single? If you are married, set forth:
a.    maiden name or the maiden name of your spouse;
b.    give the date and place of marriage.

A.3.    Widowed
a.    Shirley Arrants
b.    April 14, 1951 in Irvington, New Jersey

I.4.    Did you ever serve in the armed forces of the United States? If so state which service (Army, Navy, etc.), the branch of that service, your service identification number, the years of service, type of discharge and if a medical discharge, attach a copy hereto and set forth the medical reasons.

A.4.    Yes

Branch: Navy
Branch of Navy: Seaman, First Class V6 USNR
Service ID Number: 7141654
Years of Service: 9/21/1944 – 6/24/1946
Type of Discharge: Honorable

I.5.    If you are now or have ever been, a member of trade or labor union, provide the following:
a.    the name of the union or unions to which you have belonged;
b.    the inclusive dates of your membership in each;

{00338363.DOCX}

      c.     the numbers and complete address of the local unions to which you have belonged;

      d.     all offices or other positions which you have held in each union, identifying the office, position, and union in which held and inclusive dates the position or office was held.

A.5.   No.

I.6.    Identify all jobs and projects on which you worked with or around asbestos or materials containing asbestos and state separately as to each job or project the following:

> a. the name and location of each job (stating the plant site, city, county and state);
> b. the name and address of each employer for whom you worked;
> c. the beginning and ending dates of each job or project;
> d. the name and manufacturer of each and every product containing asbestos with which you worked or to which you were exposed on each particular job or project and a general description of each such product;
> e. the identity of your immediate superior or job superintendent on each such job or project;
> f. the identity of all persons with whom you worked on each such job or project;
> g. the approximate length of time that you worked on each such job or project;
> h. whether or not you wore a respirator or mask on each such job or project;
> i. your specific duties on each job.

A.6.   Plaintiff worked with or around asbestos on the following jobs:

I.    a.     Thuls Auto Parts, 3rd Street, Plainfield, NJ
      b.     Thuls Auto Parts, 3rd Street, Plainfield, NJ
      c.     Approximately 1947 through 1964
      d.     Plaintiff was exposed to respirable asbestos fiber from his work at Thuls Auto Parts in Plainfield, New Jersey from approximately 1947 through 1964. Mr. Brown worked in the machine shop as a heavy equipment mechanic. His responsibilities included working with and being in the immediate vicinity of others working with asbestos-containing products, including asbestos-containing gaskets, and asbestos-containing equipment, including diesel and non-diesel engines. Mr. Brown removed and replaced asbestos-containing Victor, Fel-Pro, Goodyear, McCord, and Asbestoprene gaskets on CAT, Cummings, Mack, GMC, and Kenworth diesel engines. Mr. Brown's work with and around asbestos-containing products and equipment at Thuls Auto Parts generated respirable dust to which he was exposed.
      e.     To be provided.
      f.     To be provided.
      g.     Approximately 1947 through 1964

{00338363.DOCX}

h.    No

i.    See A.6.I.d. above.

II.    a.    Machinery Maintenance, Rt 22, Greenbrook, NJ

b.    Machinery Maintenance, Rt 22, Greenbrook, NJ

c.    Approximately 1964 through 1968

d.    Plaintiff was exposed to respirable asbestos fiber from his work at Machinery Maintenance in Greenbrook, New Jersey from approximately 1964 through 1968. Mr. Brown worked as a heavy equipment mechanic. His responsibilities included working with and being in the immediate vicinity of others working with asbestos-containing products, including asbestos-containing gaskets, brakes, engines, compressors, transmissions, and equipment. Mr. Brown worked with asbestos-containing CAT and John Deere tractors and Ingersoll Rand compressors. Mr. Brown's work with and around asbestos-containing products and equipment at Machinery Maintenance generated respirable dust to which he was exposed.

e.    To be provided.

f.    To be provided.

g.    Approximately 1964 through 1968

h.    No

i.    See A.6.II.d. above.

III.    a.    DNS Construction, South Plainfield, NJ

b.    DNS Construction, South Plainfield, NJ

c.    Approximately 1968 through 1973

d.    Plaintiff was exposed to respirable asbestos fiber from his work at DNS Construction in South Plainfield, New Jersey from approximately 1968 through 1973. Mr. Brown worked as a heavy equipment mechanic. His responsibilities included working with and being in the immediate vicinity of others working with asbestos-containing products, including John Deere, Ford, and CAT cranes, bulldozers, trucks, and backhoes and Ingersoll Rand compressors. Mr. Brown's work with and around asbestos-containing products and equipment at DNS Construction generated respirable dust to which he was exposed.

e.    To be provided.

f.    To be provided.

g.    Approximately 1968 through 1973

h.    No

i.    See A.6.III.d. above.

IV.    a.    Personal Farm Equipment, NJ

b.    Personal Farm Equipment, NJ

c.    Approximately 1947 through 1973

d.    Plaintiff was exposed to respirable asbestos fiber from his work on his and his brother's personal farm equipment from approximately 1947 through

1973. Mr. Brown's responsibilities included working with asbestos-containing products and farm equipment, including John Deere farm equipment. Mr. Brown's work with and around asbestos-containing products and farm equipment generated respirable dust to which he was exposed.

    e.    To be provided.

    f.    To be provided.

    g.    Approximately 1947 through 1973

    h.    No

    i.    See A.6.IV.d. above.

I.7.    As to each exposure to each product listed in the answer to the immediately preceding interrogatory, describe by name or other description the persons or documents which you claim will establish the fact of your exposure to the product. For each witness listed, state the witnesses complete name, job title or capacity, employer, address, and telephone number. For each document listed, state a description of the document, its contents and the name, address, and telephone number of the custodian of the document.

    A.7.    Plaintiff will rely on his own knowledge and may also rely upon testimony of co-workers and family members, if available. In addition, Plaintiff believes that defendants and others possess documents responsive to this interrogatory.

I.8.    Have you at any time during your life ever used any device to reduce your possible exposure to, or inhalation of, asbestos dust or fibers? If you answer in the affirmative, please state for each such device:

    a.    make, model and type;

    b.    from whom received;

    c.    company or employer requirements regarding use of such device;

    d.    name, address, phone number of company or employer, document title, date and description of the source of such requirement(s) or recommendation(s);

    e.    date and time of each period of use of such device;

    f.    if you will do so without a motion to produce, please attach a copy of each writing which evidences the requirements or recommendations referred to in subpart (c) and (d) of this interrogatories.

    A.8.    No.

I.9.    Identify the disease or injuries for which claim is made by you in the above captioned complaint, and as to such disease or injury provide the following information:

    a.    a description of the symptoms of the disease or injury;

{00338363.DOCX}

   b.  the date you first experienced any of the symptoms of the disease or injury described above;

   c.  the name and address of each doctor or other practitioner of the healing arts who has either examined or treated you for the disease or injury described above and the dates of such treatment or examination;

   d.  the treatment provided by each doctor or other practitioner of the healing arts for the disease or injury identified above.

 A.9 Plaintiff suffers from mesothelioma.

   a.  Plaintiff experiences pain and suffering, mental and emotional distress, shortness of breath, crackling noises in the lungs, coughing, swelling of the fingers, discoloration of the skin, wheezing, weight loss, respiratory discomfort and sputum production. Plaintiff's mesothelioma has limited his quality of life. He can no longer benefit from certain hobbies. All physical activity is restricted. Plaintiff's mesothelioma has disrupted his life, interfered with his familial, social, and other relationships, and has caused him anxiety, fatigue, discomfort and inconvenience.

   b.  See medical records. Authorizations will be provided to RecordTrak. www.recordtrak.com

   c.  At this time Plaintiff recalls the following physicians:

     i.  St. Thomas Hospital
       4220 Harding Road
       P.O. Box 380
       Nashville, TN 37202

     ii.  Asa Heflin, MD
       4230 Harding Pike
       Nashville, TN 37205

   d.  See medical records. Authorizations will be provided to RecordTrak. www.recordtrak.com

I.10. State the date of diagnosis made by any physician or other practitioner of the healing arts of the disease or injury which you set forth in your answer to interrogatory 9 and identify the individual making such diagnosis.

 A.10. Plaintiff was diagnosed with mesothelioma in May of 2012.

I.11. State the date you learned of the diagnosis of such disease or injury.

 A.11. Plaintiff learned of his diagnosis of in May of 2012.

{00338363.DOCX}

I.12.    If you have received any treatment with respect to the disease or injury set forth in your answer to interrogatory 9, state:

        a.     the name and address of each hospital, clinic, or other medical facility at which you were treated or admitted;

        b.     the dates on which said treatment or treatments were rendered, including the dates of entry into and discharge from said hospitals, clinics or other medical facility.

A.12.    Yes.

        a.     Leonard J. Wudel, MD
4230 Harding Road, Suite 530, Nashville, TN 37205

        b.     See medical records. Authorizations will be provided to RecordTrak. www.recordtrak.com.

        a.     Victor Gian, MD
1840 Medical Center Parkway, Suite 300, Murfressboro, TN 37129

        b.     See medical records. Authorizations will be provided to RecordTrak. www.recordtrak.com.

        a.     Maury Regional Medical Center
1224 Trotwood Avenue, Columbia, TN 38401

        b.     See medical records. Authorizations will be provided to RecordTrak. www.recordtrak.com.

I.13.    Identify each physician or other practitioner of the healing arts not previously identified hereto who has examined or treated you for any reason and for each such individual so identified provide the following information:

        a. the reason for such examination or treatment;

        b. the date of each examination or treatment;

        c. the diagnosis resulting from each such examination or treatment.

A.13.    Victor Gian, MD
1840 Medical Center Parkway, Suite 300, Murfressboro, TN 37129
a. See medical records. Authorizations will be provided to RecordTrak. www.recordtrak.com;
b. See medical records. Authorizations will be provided to RecordTrak. www.recordtrak.com;
c. See medical records. Authorizations will be provided to RecordTrak. www.recordtrak.com.

I.14.    Identify each hospital, clinic or other medical facility not previously identified herein at which you have been examined or have received medical treatment and for each such facility identified provide the following information:

a. the reason for such examination or treatment;

b. the date of each such examination or treatment;

c. if you were an inpatient, the dates of admission to and discharge from such hospital, clinic or medical facility;

d. the diagnosis resulting from each such examination or treatment.

A.14.   See A12. *supra*.

I.15.   If you are currently receiving medical services or treatment of any nature whatsoever, state:

a. the name or names of the person or persons attending you;

b. the approximate frequency of said treatment or services;

c. the date you last received said treatments or services.

A.15.

Victor Gian, MD
1840 Medical Center Parkway, Suite 300, Murfressboro, TN 37129
a. See medical records. Authorizations will be provided to RecordTrak. www.recordtrak.com;
b. See medical records. Authorizations will be provided to RecordTrak. www.recordtrak.com;
c. See medical records. Authorizations will be provided to RecordTrak. www.recordtrak.com.

Dr. Balatico MD, 1109 E College St, Pulaski, TN
a. See medical records. Authorizations will be provided to RecordTrak. www.recordtrak.com;
b. See medical records. Authorizations will be provided to RecordTrak. www.recordtrak.com;
c. See medical records. Authorizations will be provided to RecordTrak. www.recordtrak.com.

I.16.   If you have ever had x-rays taken of your chest, provide the following information for each set of x-rays taken:

a. the name and address of the office or hospital where the x-rays were taken;

b. the reason why such x-rays were taken;

c. the date on which the x-rays were taken;

d. the information reported to you as being the x-ray diagnosis;

e. the identity of the person or persons who took the x-rays and the person or persons who made the diagnosis.

A.16.   Yes.

i.      a. St. Thomas Hospital, 4220 Harding Road, Nashville, TN 37205
b. See medical records. Authorizations will be provided to RecordTrak

www.recordtrak.com
c. See medical records. Authorizations will be provided to RecordTrak
www.recordtrak.com
d. See medical records. Authorizations will be provided to RecordTrak.
www.recordtrak.com
e. See medical records. Authorizations will be provided to RecordTrak.
www.recordtrak.com

ii.    a. Hillside Hospital, Pulaski, TN 38478
b. See medical records. Authorizations will be provided to RecordTrak
www.recordtrak.com
c. See medical records. Authorizations will be provided to RecordTrak
www.recordtrak.com
d. See medical records. Authorizations will be provided to RecordTrak.
www.recordtrak.com
e. See medical records. Authorizations will be provided to RecordTrak.
www.recordtrak.com

iii.    a. VA Medical Center Murfreesboro, 3400 Lebanon Road, Murfreesboro,
TN 37129
b. See medical records. Authorizations will be provided to RecordTrak
www.recordtrak.com
c. See medical records. Authorizations will be provided to RecordTrak
www.recordtrak.com
d. See medical records. Authorizations will be provided to RecordTrak.
www.recordtrak.com
e. See medical records. Authorizations will be provided to RecordTrak.
www.recordtrak.com

I.17.    If you have filed any claim with the Social Security Administration as a result of any injuries or disease, provide the following information:
a. the date you filed said claim;
b. the nature of such claim;
c. the date upon which you first received any benefits, either for disability or for medical treatment;
d. the amount of benefits you are receiving and the frequency with which you receive these benefits.

A.17.    No

I.18.    Have you ever been convicted of a crime? If so state the following:
a. the date of each arrest;
b. the nature of each alleged offence;
c. the place of each arrest;

{00338363.DOCX}

d. the outcome of each charge, indicating whether you were convicted or plead
guilty;

e. the court where the matter was heard and the date of the hearing.

A.18.  No.

I.19.  Do you or your counsel have written reports from any physician or practitioner of the
healing arts respecting any injuries or diseases which you have identified in your response to
these interrogatories? If so please attach a copy of said report to your answers to these
interrogatories.

A.19.  See medical records. Authorizations will be provided to RecordTrak.
www.recordtrak.com

I.20.  As to any job or jobs on which you allege you were injuriously exposed to asbestos
containing materials, was there any company other than your employer installing asbestos
containing material at the same job site? If so, please identify each job, its location, the
approximate dates on which you worked on that job and the other company.

A.20.  See A.6 *supra*. Discovery is continuing and ongoing.  Plaintiff reserves his right
to supplement this answer.

I.21.  Do you now, or have you ever, chewed, smoked, consumed, or otherwise used
tobacco products? If so, please state:

a. the type or types of products (i.e., cigarettes, cigars, etc.);
b. the brand name of each product listed above; (indicating whether filtered or non
filtered as to each brand);
c. the inclusive dates of use of each product listed above;
d. the frequency of use or amount of use (i.e. one pack a day, etc.).

A.21.  a. Plaintiff smoked cigarettes
b. Marlboro and Pall Mall
c. 1944-1950
d. Infrequently

a. Plaintiff smoked cigars
b. Dutch masters cigars
c. 1950-1994
d. Infrequently

I.22.  Are you aware of the United State Surgeon General's warning placed on all cigarette
packages and advertisement?

A.22.  Plaintiff objects to this interrogatory as vague, ambiguous, and not reasonable
calculated to lead to discovery of admissible evidence.

{00338363.DOCX}

I.23.   Have you ever read the warning referred to in interrogatory I22?

    A.23.   Plaintiff objects to this interrogatory as vague, ambiguous, and not reasonable calculated to lead to discovery of admissible evidence.

I.24.   Have you ever smoked cigarettes subsequent to being aware of or reading the warning referred to in interrogatory I22?

    A.24.   Plaintiff objects to this interrogatory as vague, ambiguous, and not reasonable calculated to lead to discovery of admissible evidence.

I.25.   Have you ever smoked tobacco products other than cigarettes subsequent to being aware of or reading the warning referred to in interrogatory I22?

    A.25.   Plaintiff objects to this interrogatory as vague, ambiguous, and not reasonable calculated to lead to discovery of admissible evidence.

I.26.   State the names and current addresses of all persons who have knowledge of any relevant facts relating to this case. Unless already set forth in answers to a prior question, set forth in detail the facts of which each person allegedly has knowledge.

    A.26.   Plaintiff is unaware of any other person or persons who have relevant knowledge other than his family, doctors, former co-workers and the defendants herein. Plaintiff reserves his right to amend and supplement his response. See A.7 *supra*.

I.27.   Did you ever file a Workman's Compensation claim for any or all of the injuries claimed in this action? If so state:
        a. the claim petition number;
        b. the name and address of the Workman's Compensation insurance company and its file number;
        c. the terms of final judgment, if concluded;
        d. attach hereto copies of all reports of all doctors who examined or treated you with regard to these claims;
        e. attach copies of the Claim Petition and Answer in said proceedings and copy of the judgement, Order Approving Settlement, Order of Discontinuance, and/or any other Order of the Court disposing of the Workmen's Compensation Petition;
        f. the name and address of the attorney who represented you in that proceeding.

    A.27.   No.

I.28.   Did you file a Workman's Compensation claim at any time for any reason for any condition and/or injury other than those mentioned in the foregoing interrogatory? If so, state:
        a. the claim petition number;

{00338363.DOCX}

b. the name and address of the Workman's Compensation insurance company and its file number;

c. the terms of final judgment, if concluded;

d. attach hereto copies of all reports of all doctors who examined or treated you with regard to these claims;

e. attach copies of the Claim Petition and Answer in said proceedings and copy of the judgement, Order Approving Settlement, Order of Discontinuance, and/or any other Order of the Court disposing of the Workmen's Compensation Petition;

f. the name and address of the attorney who represented you in that proceeding.

A.28.   No.

I.29.   Give a complete history of your employment including:

a. the date you were hired;

b. the name of each department and each plant in which you worked during your employment, giving the inclusive dates you worked in each;

c. a detailed description of your duties in each of said departments;

d. whether there was any exposure by you during the aforementioned periods of employment to any dust, fumes or other conditions;

e. if so, set forth in detail the nature of the exposure;

f. the date your employment was terminated and the reasons therefore

A.29.   See A.6. *supra.*   Plaintiff further responds: See Social Security Earning Information records.   Authorizations will be provided to RecordTrak. www.recordtrak.com

I.30.   Are you presently receiving any form of benefits under any insurance policy or policies, retirement program or programs, pensions, Social Security or from any person, firm corporation, governmental body or agency? If so, set forth full details in regard thereto.

A.30.   Yes. Plaintiff has been receiving Social Security since 1991. His present monthly amount is $1,531, as well as a VA pension of $2,858.24 monthly.

I.31.   Give the exact date upon which you became aware that those symptoms referred to in answers to interrogatories I9 and I11 were caused by the alleged acts of any party to this lawsuit. Please respond separately as to each party so named by you. If advised by another of said cause, set forth the name and correct address of that person.

A.31.   In May of 2012, Plaintiff was diagnosed with mesothelioma.

{00338363.DOCX}

I.32.   If you were employed at the time the symptom, injury and/or condition complained of in the present action manifested itself, state as to each date of manifestation of symptoms, injury and/or condition the following:

      a. the name and address of the employer;

      b. the position held and nature of work performed;

      c. your average weekly wages for the previous year;

      d. the period of time lost from employment, if any, giving dates;

      e. the amount of wages lost, if any;

      f. attach W-2 forms of I.R.S. returns for the last five (5) years.

A.32.   Not applicable

I.33.   If there has been a return to employment or occupation, state:

      a. the name and address of present employer;

      b. position held and nature of work performed;

      c. present weekly wages, earnings, income or profit.

A.33.   Not applicable

I.34.   Itemize any and all moneys expended or expenses incurred for hospitals, doctors, nurses, x-rays, medicines, care and appliances and state the name and address of each payee and the amount paid or owed each payee.

    A.34.   Expenditures are being compiled. Plaintiff reserves the right to amend his answer.

I.35.   Itemize any and all other losses or expenses incurred not otherwise set forth.

    A.35.   Expenditures are being compiled. Plaintiff reserves the right to amend his answer.

               LEVY KONIGSBERG, LLP
               Attorneys for Plaintiffs

               Leah Kagan
               800 3rd Avenue, 11th Floor
               New York, NY 10022

Date: June 6, 2014

{00338363.DOCX}

## CERTIFICATION

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willingly false, I am subject to punishment.

_____
Harold Brown

Dated: June ___, 2014

{00338363.DOCX}

# Exhibit E

Page 1

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY

HAROLD BROWN,

    Plaintiff,

vs.                                          DOCKET NO. MID-L-2641-14AS
                                                   Civil Action
                                                 Asbestos Litigation
CATERPILLAR, INC., et al.,

    Defendants.

_____

VIDEOTAPED DEPOSITION OF

HAROLD BROWN

Volume 1 of 2

Taken on Behalf of the Defendants

June 9, 2014

JOB NO.:   1875928

Page 91

about 1947?

A.      Right.

Q.      Okay.  So what did you do in the time between finishing the Navy and starting at Thuls?

A.      Just that one year with my father.

Q.      I see.  So it was that exact time period?

A.      Uh-huh.

Q.      Do you remember the -- the season or the month that you started at Thuls in 1947?

A.      No, I don't remember.

Q.      How did you manage to get a job at Thuls?

A.      I went down there and applied for it.

Q.      What kind of job did you apply for?

A.      We built engines.  And I -- I started off just stripping the engines down.

Q.      So when you -- when you came to Thuls, you knew in your -- already that you wanted to be involved with rebuilding engines?

A.      Yep.

Q.      Did you have any training from previous that involved rebuilding engines?

A.      No.

Q.      Okay.  So did they hire you at some kind of entry level --

A.      Yes.

Page 144

you rebuild it.  It has to fit in there tight.

Q.      I understand.  But they couldn't bring the trucks to Thuls for you to do that work?  You would have to go out --

A.      We -- we -- we didn't bring trucks into the shop to rebuild them when they were in there.

Q.      Okay.  All right.  Let's talk also about the -- not the work that you did, but the work that other people did --

A.      Yeah.

Q.      -- when you were at Thuls.  You mentioned that there were auto mechanics just doing the -- the general maintenance-type stuff, right?

A.      Uh-huh.

Q.      Okay.  In terms of -- you mentioned before that -- that you didn't do brakes, but other guys at Thuls did brakes, correct?

A.      Yeah.

        That was in that other building.

Q.      They were in the other building?

A.      (Nods head affirmatively.)

Q.      Was there a wall that separated the two buildings?

A.      Yeah.

Q.      Okay.  Were you walking to the building,

Page 145

into that other shop, though, when they --

A.    Very seldom.

Q.    Very seldom?

A.    They kept me busy -- they kept me busy out there.

Q.    And so you'd be mostly working in your area?

A.    That's right.

Q.    Okay.

But do you -- do you have any knowledge about the -- the -- the work that other Thuls people, the auto mechanics or truck mechanics, would do on brakes?  Do you know, like, the work practices they would do to -- to change brakes?

A.    Well, they would turn brake drums over there too, stuff like that.

Q.    So in terms of turning the brake drums, that's a machining kind of process, right?

A.    That would be over in the machine shop.

Q.    Would they do -- do you know whether they had any kind of equipment like, for instance, are you familiar with the term "arc grinder"?

A.    Arc?

Q.    "Arc grinder," have you ever heard that term?

Page 148

was contracted out by anybody to be an authorized

re-liner for a particular brake company?

A.      No.

Q.      Okay.  Do you know, at the time when they

re-lined, whether the brakes would be riveted or

whether it would be glued or bonded?

A.      Well, they did -- they did both.

Q.      Okay.

A.      But then they had -- mostly that would be

for trucks and stuff like that.  But Bendix had --

they -- if you wanted -- if you had a Ford engine,

and you had Ford brakes, you could probably go to

the parts counter and get a set of brake shoes

right off the counter.

Q.      I see.  So Thuls would sell parts also?

A.      Yeah.  Oh, yeah.

Q.      So did you ever have any responsibility at

the counter selling?  Did you ever sell parts at

the counter?

A.      Me?

Q.      Yeah.

A.      No.  No.

Q.      Okay.  Did you ever see anybody re-lining

brakes that would later go into a box and say

Bendix, for instance?

Page 238

REPORTER'S CERTIFICATE

I certify that the witness in the foregoing deposition, HAROLD BROWN, was by me duly sworn to testify in the within entitled cause; that the said deposition was taken at the time and place therein named; that the testimony of said witness was reported by me, a Shorthand Reporter and Notary Public of the State of Tennessee authorized to administer oaths and affirmations, and said testimony, pages 1 through 237, was thereafter transcribed to typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said deposition.

IN WITNESS WHEREOF, I have hereunto set my hand on June 18, 2014.

Terri Beckham, RPR, RMR, CRR, LCR No. 355
My commission expires:  3/6/2018

Page 239

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION - MIDDLESEX COUNTY

HAROLD BROWN,

    Plaintiff,

vs.                                              DOCKET NO. MID-L-2641-14AS
                                                       Civil Action
                                                    Asbestos Litigation
CATERPILLAR, INC., et al.,

    Defendants.

_____

VIDEOTAPED DEPOSITION OF

HAROLD BROWN

Volume 2 of 2

Taken on Behalf of the Defendants

June 10, 2014

JOB NO.:  1875932

Page 256

A.        A Mack?   Over a hundred thousand or better.

Q.        Okay.

Yesterday you testified that your -- you did much more auto than you did truck.

A.        Yeah.

Q.        And I wasn't sure whether you were talking about light-duty pickup trucks or -- or heavy equipment, like a Mack truck.

A.        Mack -- well, now -- you say Mack truck. I went to Queens, New York, to Mack's training school.  I took a course over there when they first came out with the first Mack diesel.

I took -- I went every -- every course, every night that -- they had it on a special night.  And I'd go from New Jersey over to New York, Queens, and spend the night with the guys from Mack Motors in Plainfield, New Jersey.

Q.        Okay.  Were there other brands of trucks or manufacturers of trucks that had courses like that?

A.        Not -- not to my knowledge, no.

Q.        So what I'm trying to get at is, can you give me an estimate -- an estimate for how many trucks, heavy trucks that were worked on, truck

Page 257

engines, that were worked on at Thuls as compared to cars or light-duty trucks?

A.        Probably between 5 to 10 percent.

Q.        Okay.  Of those 5 to 10 percent, what were the manufacturers or brands of trucks that the engines came out of?

A.        Besides the White -- besides the Macks, it was White trucks, Cummins, Detroits.  There was some Waukesha.  There was some others, I just can't think of them right now.

Q.        Okay.  When -- when you said Cummins, Detroit and Waukesha, my understanding is that those are brands of engines?

A.        Yes.

Q.        Okay.  My question was, what other types of trucks did the engines come out of, to your knowledge?

A.        Oh, besides the Mack trucks, the GMC trucks, there was some Ford over-the-road trucks that had a larger Ford engine into them.

And there was Dodges and the Chevies, too.  The Chevies -- you get the Chevies in there too?

Q.        Am I correct that you could have, for example, a Cummins engine or a Detroit engine coming out of any one of these type of trucks?

Page 433

REPORTER'S CERTIFICATE

I certify that the witness in the foregoing deposition, HAROLD BROWN, was by me duly sworn to testify in the within entitled cause; that the said deposition was taken at the time and place therein named; that the testimony of said witness was reported by me, a Shorthand Reporter and Notary Public of the State of Tennessee authorized to administer oaths and affirmations, and said testimony, pages 239 through 432, was thereafter transcribed to typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said deposition.

IN WITNESS WHEREOF, I have hereunto set my hand on June 18, 2014.

Terri Beckham, RPR, RMR, CRR, LCR No. 355
My commission expires:  3/6/2018

# Exhibit F

NEW YORK STATE SUPREME COURT
COUNTY OF NEW YORK

-------------------------------------------------------------- x

In Re: NEW YORK CITY
    ASBESTOS LITIGATION

--------------------------------------------------------------

This Document Applies to All Cases

--------------------------------------------------------------- x

    :   NYCAL I.A.S. Part 39
    :   (Freedman, J.)
    :   Index No. 40,000
    :
    :   HONEYWELL INTERNATIONAL
    :   INC.'S SUPPLEMENTAL
    :   RESPONSES TO PLAINTIFFS' FIRST
    :   STANDARD SET OF LIABILITY
    :   INTERROGATORIES AND REQUEST
    :   FOR PRODUCTION OF
    :   DOCUMENTS

## INTRODUCTORY STATEMENT

On April 1, 1985, The Bendix Corporation was merged into Allied Corporation and ceased to exist as a legal entity. On September 30, 1987, Allied Corporation was merged into AlliedSignal Inc. and ceased to exist as a legal entity. On December 4, 1999, AlliedSignal Inc. merged with Honeywell International Inc. and Honeywell Inc. ceased to exist as a legal entity. On December 4, 1999, AlliedSignal Inc. changed its name to Honeywell International Inc. ("Honeywell").

The Bendix Corporation was incorporated in the State of Delaware and maintained its principal place of business in the State of Michigan. Allied Corporation was incorporated in the State of New York and maintained its place of business in the State of New Jersey. Honeywell is incorporated in the State of Delaware and maintains its principal place of business in the State of New Jersey.

Honeywell is the successor in interest to AlliedSignal Inc., which in turn, was the successor in to The Bendix Corporation. Honeywell's Friction Materials, LLC is the business unit within Honeywell that continues the "Bendix" line of automotive friction products.

1

NYK 879043-1.037354.0036

The Interrogatories herein seek information for a period of 70 to 80 years. Individuals who may have had knowledge responsive to some of the Interrogatories are, due to the passage of time, deceased, or have faded memories, or are otherwise no longer available to Honeywell. Consequently, and notwithstanding the best efforts of Honeywell, potentially responsive information may have simply been lost before the time litigation ever commenced. Honeywell has, however, endeavored to obtain and record information from former employees of Honeywell, or its predecessors, if they were available to Honeywell through direct interviews and/or review of relevant deposition or trial testimony. In addition, Honeywell has searched its files for written or otherwise recorded materials that may contain information responsive to these Interrogatories. In that effort, documents in corporate headquarters and manufacturing facilities, to the extent that such documents still exist after the passage of many years, have been gathered and where relevant and responsive are made available for inspection and copying. Understanding that not every document or item of information could possibly be identified and referred to herein, Honeywell asserts that such documents may supplement, expand upon and/or provide more detailed response to these Interrogatories and therefore are incorporated by reference herein.

The responses to Plaintiffs' Interrogatories, therefore, are based upon: (a) information supplied by employees of The Bendix Corporation or documents in the possession of The Bendix Corporation through March 31, 1985; (b) information or documents acquired by or known to employees of the Automotive Sector of Allied Corporation from April 1, 1985, through September 29, 1987; (c) information or documents acquired by or known to employees of the Automotive Sector of AlliedSignal Inc. since September 30, 1987; (d) information or documents acquired by or known to employees of the Automotive Sector within Honeywell which has

2

continued the "Bendix" line of friction automotive products since December 4, 1999; and (e) deposition testimony of Eugene Rogers, a former Bendix employee with knowledge of many of the issues raised by plaintiffs' interrogatories.

In these responses, "Honeywell" refers to: (a) The Bendix Corporation prior to April 1, 1985; (b) the Automotive Sector of Allied Corporation from April 1, 1985 to September 29, 1987; (c) the Automotive Sector of AlliedSignal Inc. from September 30, 1987 through December 4, 1999; and (d) the friction materials business of Honeywell from December 4, 1999 to the present. Therefore, for purposes of these responses, the defendant responding refers to the Bendix related friction materials products. As the context of particular questions may require, the automotive friction products manufactured by Honeywell and its predecessors will be described by reference to their registered trademark, "Bendix." Questions directed to matters of corporate identity (*e.g.*, state of incorporation, principal place of business, etc.) are answered as they apply to Honeywell.

GENERAL OBJECTIONS

Honeywell generally objects to these Interrogatories as being unduly burdensome, overly broad as to time, scope and location, lacking in particularity and repetitious. Objection is made to the extent these Interrogatories assume the truth of facts not proven or facts not in evidence. Objection is made to these Interrogatories on the grounds that they seek information that is not relevant and/or not reasonably calculated to lead to the discovery of admissible evidence.

Honeywell also objects to these Interrogatories to the extent they seek information or materials which have been gathered or prepared in the course of the asbestos litigation, or which is otherwise protected by the attorney-client privilege, the work product doctrine, or by any other

3

applicable privilege. Honeywell also objects to these Interrogatories to the extent that they seek confidential or trade secret information or materials.

In particular:

Honeywell objects that these Interrogatories are directed towards information and specifications about products that are not related in any way to plaintiffs' case.

Honeywell objects that these Interrogatories ask Honeywell to provide information about asbestos containing products in general. Automotive friction materials are application-specific (i.e., designed to fit only a specific model of vehicle). Typically, more than one manufacturer supplies either brakes, or friction materials, or both for some but not all models in a given year's vehicle production (e.g., different manufacturers for the front and rear brakes or a "running change" of suppliers during production of a given model, or different suppliers for different models).

To the extent these Interrogatories seek information regarding health risks to individuals who worked at non-Honeywell sites or where asbestos-containing products were manufactured, distributed or installed, Honeywell objects on the ground that the inquiries are not reasonably calculated to lead to the discovery of admissible evidence. See, e.g., Lohrman v. Pittsburgh-Corning Corp., et al., 782 F.2d 1156, 1161 (4th Cir. 1986); Martin v. Johns-Manville Corp., 494 A.2d 1088, 1099 (Pa. 1985).

Honeywell further objects to these Interrogatories to the extent they seek privileged personnel information, and Honeywell will not provide such information absent an appropriate waiver of the applicable privilege.

Honeywell objects to these Interrogatories to the extent that they seek to require it to respond other than in accordance with the CPLR. Thus, Honeywell denies any obligation to (a)

4

locate or interview former employees or any other person not presently employed or engaged by Honeywell; (b) generate documents not presently existing; (c) describe its unsuccessful efforts to answer any interrogatory; (d) identify an unknown custodian or the current custodian of documents not in Honeywell's possession; (e) identify the file designation and other identifying designation, the present location, or the source of documents identified unless specifically requested in the interrogatory; (f) add to or change the meaning of any interrogatory in the conjunctive or disjunctive; (g) respond to any aspect of the interrogatory not described with reasonable particularity by the express language of the interrogatory; or (h) provide medical or other expert opinion beyond the scope of Honeywell's business.

Honeywell objects to these Interrogatories pursuant to the CPLR to the extent they seek to require it to provide information or to identify any documents or other tangible things prepared or obtained in anticipation of litigation or for trial where the plaintiffs have not shown that they (1) have substantial need for the materials in the preparation of the case and (2) are unable to obtain the substantial equivalent of the materials by other means without undue hardship.

Honeywell objects to these Interrogatories to the extent that they seek to require it to gather and summarize information contained in voluminous papers that are already a matter of public record.

Honeywell objects to these Interrogatories to the extent they seek to require it to provide information that is equally available to the plaintiffs as to Honeywell.

Honeywell hereby adopts the motions and objections of the other defendants, and reserves the right to adopt future motions and objections relating to Plaintiffs' Interrogatories.

Finally, Honeywell objects to Plaintiffs' Interrogatories in their entirety on the grounds that requiring Honeywell to provide the required information with respect to each and every

5

asbestos containing friction product that it manufactured, prior to requiring Plaintiffs to identify the specific Honeywell products, if any, to which they allege exposure, is highly prejudicial.

Honeywell does not concede that any of its answers to these Interrogatories are, or will be, admissible evidence at a trial of this action, and Honeywell does not waive any objection, or any ground, whether or not asserted herein, to the use of any such answer at trial.

These General Objections are explicitly made a part of, and incorporated by reference in, each response hereinafter provided.

6

Q8.     State the names and positions of all corporate officers or officials having the responsibility for creating, directing or setting the policy of your firm with regard to the mining, manufacturing, processing, sale and/or packaging of asbestos products since 1930.

RESPONSE:        Honeywell objects to this interrogatory as it is overly broad, unduly burdensome, unlimited in scope and not reasonably calculated to lead to the discovery of admissible evidence. In addition, the interrogatory incorrectly assumes that defendant engaged in each of the listed activities, which it did not.

Q9.     Have you or any of your predecessors or subsidiaries ever mined, processed, refined, sold or distributed asbestos or asbestos containing products. If so, for each such product, complete an "Asbestos Product Information Sheet, Attachment #1.

RESPONSE:        Honeywell objects to this interrogatory on the ground that it is overbroad and seeks irrelevant information not reasonably calculated to lead to the discovery of admissible evidence since, among other things, it is not limited to the relevant time period, geographic area or to the friction products to which Plaintiffs claim exposure. Honeywell also objects to this interrogatory on the grounds that it is misleading to the extent that it incorrectly assumes that Honeywell engaged in each of the listed activities, which it did not.

Without waiving its objections, Honeywell states that the friction products manufactured and sold by it or its predecessor corporations for domestic use are as follows:

12

Brake Linings:

| | |
|---|---|
| "Bendix" | 1939 to 2001 |
| "Marshall" | 1939 to 2001 |
| "Bulls-eye" | 1939 to 1948 |
| "SL" | 1939 to 1971 |
| "WM" | 1939 to 1971 |
| "Eclipse" | 1939 to 1987 |
| "Master" | 1945 to 1987 |
| "EDF" | 1946 to 2001 |
| "FK" | 1955 to 2001 |
| "Friction King" | 1960 to 2001 |

Disc Brake Pads:

| | |
|---|---|
| "Bendix" | 1963 to 2001 |
| "Friction King II" | 1979 to 1987 (asbestos-free wearing surface) |

Brake Blocks:

| | |
|---|---|
| "Bendix" | 1948 to 1988 |

Clutch Facings:

| | |
|---|---|
| "Bendix" | 1975 to 1978 (sold only to the Chicago, Illinois plant of Borg and Beck) |

In addition, deposition testimony of corporate representative Eugene Rogers suggests that Bendix purchased a small quantity of brake blocks from Worldbestos Company in the early 1950s. His testimony further suggests that during a strike at the Cleveland plant, disc brake lining pads were purchased from Raymark in the late 1970s or early 1980s. Mr. Rogers' testimony indicates that a small amount of after-market linings were purchased from Lear-Siegler for after-market use only at about the same time; and that Bendix purchased woven molded flexible brake linings from Southern Friction (later known as Scandura) during the 1950s and early 1960s.

Mr. Rogers' testimony also suggests that for a period of time in the late 1940s and early 1950s, Bendix manufactured aircraft brake linings that contained asbestos for three military aircraft.

13

introduced in 1987. Asbestos-free drum brake lining segments and disc pads for most passenger car and light truck "aftermarket" applications were introduced in 1988. A full line of asbestos-free brake blocks for heavy vehicles was introduced in 1988.

With respect to studies conducted, Honeywell refers to its response to Q11.

Q29. Have any officers or employees of defendant ever discussed or evaluated whether sales of your asbestos products would be damaged if the public learned of the health hazards associated with asbestos exposure? If so, state the dates and names of participants of each such meeting and identify all documents relating to such meeting.

RESPONSE:      Honeywell objects to this Interrogatory as it is harassing and not calculated to lead to the discovery of admissible evidence. In addition, Honeywell is not aware of any minutes of its Board of Directors which reference discussions of asbestos products and alleged health hazards.

Q30. At the time of the development of, and sale of each of your asbestos products did you attempt to determine whether the product complied with any allegedly applicable safety standards, orders or rules, regulations or design requirements promulgated by any professional society, association, or government body?

a.      If you did not, please state the reasons for not conducting such an analysis and identify the name of the person deciding not to conduct the analysis;

ATTACHMENT I

ASBESTOS PRODUCT INFORMATION SHEET

(a)    A description of the product:  brake linings, disc brake pads, brake blocks and clutch facings during certain periods to time.

(b)    Generic Name: See (a).

(c)    Brand Name:

| Brake linings | Brand Name | Years Manufactured |
|---|---|---|
| | Bendix | 1939 to 2001 |
| | Marshall | 1939 to 2001 |
| | Bulls-eye | 1939 to 1948 |
| | SL | 1939 to 1971 |
| | WM | 1939 to 1971 |
| | Eclipse | 1939 to 1987 |
| | Master | 1945 to 1987 |
| | EDF | 1946 to 2001 |
| | FK | 1955 to 2001 |
| | Friction King | 1960 to 2001 |
| Disk Brake Pads | Bendix | 1963 to 2001 |
| | Friction King II | 1979 to 1987 (Asbestos-free wearing service) |
| Brake Blocks | Bendix | 1948 to 1988 |
| Clutch Facings | Bendix | 1975 to 1978 (Sold only to the Chicago, Illinois plant of Borg & Beck) |

(d)    Trademark Name, Number, Registration date, and period of Trademark Use:  See response to (c).

(e)    Asbestos Content by Percentage:  Honeywell objects to this request on the ground that it is. overbroad, unduly burdensome, and seeks irrelevant information not reasonably calculated to lead to the discovery of admissible evidence since, among other things, it is not limited to the relevant time period, jobsites or friction products relevant to Plaintiffs' claims.  Honeywell also objects to this request because the composition of its friction products is a trade secret and, therefore, proprietary information.  Without waiving these

93

objections, Honeywell states that over the years, motor vehicle manufacturers have made changes in vehicle design (weight, chassis length, engine performance, etc.) and in brake performance criteria (noise, durability and stopping distance limits) which required modifications in product formulations to meet the changed criteria. As a result, the percentage of processed chrysotile asbestos fiber in asbestos-containing brake linings and disc brake pads has varied depending upon the composition of a particular item but, on average, was approximately 50% (by weight). The percentage of processed chrysotile asbestos fiber in asbestos-containing brake blocks varied depending upon the composition of a particular item but, on average, was approximately 35% (by weight). The percentage of processed chrysotile asbestos fiber in asbestos-containing clutch facings was 44% (by weight). Brake linings and disc brake pads also contain a resin binder system and various friction modifiers and fillers that encapsulate the processed chrysotile asbestos fibers. Asbestos-containing clutch facings (manufactured between 1975 and 1978) and asbestos-containing brake blocks (manufactured between 1948 and 1988) also contained a resin binder system and various friction modifiers and fillers which encapsulated the processed chrysotile asbestos fibers.

(f)     Type of Asbestos: See response to (e).

(g)     Mineralogical and/or constituent composition by weight of each constituent:     See response to (e).

(h)     Inclusive Dates of Manufacture: See response to (c).

(i)     Inclusive Dates of Sale: See response to (c).

(j)     Name of Manufacturer and place of manufacture: Honeywell objects to this request on the ground that these cases do not involve Honeywell employees working at manufacturing facilities, is not limited to friction products and is not limited in geographic location. Without waving those objections, Honeywell states that it has manufactured asbestos-containing friction products for domestic production at facilities in Green Island, NY from 1939 to 2001 and at Cleveland, TN from 1965 to 2001.

(k)     Did you "rebrand" or sell the product to others for resale by them under some other name? If so, for who and when: See response to Q19.

(l)     Did you purchase the product from another manufacturer? If so, from whom, when and under what other name was it sold: See response to Interrogatory No. 9.

(m)     The color, physical description and characteristics of the product: See response to (e).

(n)     The purpose of using asbestos as an ingredient in the product: See response to (e).

(o)     The number and date of each patent or patent application relating to the product: Not applicable.

94

# Exhibit G

EFiled: May 1 2006 2:37PM EDT
Transaction ID 11170459

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
IN AND FOR NEW CASTLE COUNTY

IN RE: ASBESTOS LITIGATION     )     C.A. No. 77C-ASB-2

)
)

### HONEYWELL INTERNATIONAL, INC. f/k/a ALLIED SIGNAL, INC., AS SUCCESSOR-IN-INTEREST TO BENDIX CORPORATION'S AMENDED ANSWERS TO PLAINTIFFS' MASTER SET OF INTERROGATORIES

Defendant, Honeywell International, Inc. f/k/a Allied Signal, Inc. as successor-in-interest to Bendix Corporation, solely and exclusively in its capacity as successor in interest to the Bendix Corporation, by and through its attorneys, hereby serves Amended Answers to Plaintiffs' Master Set Interrogatories.

### INTRODUCTORY STATEMENT

On April 1, 1985, The Bendix Corporation was merged into Allied Corporation and ceased to exist as a legal entity. On September 30, 1987, Allied Corporation was merged into AlliedSignal Inc. and ceased to exist as a legal entity. On December 4, 1999, AlliedSignal Inc. merged with Honeywell Inc. and Honeywell Inc. ceased to exist as a legal entity. On December 4, 1999, AlliedSignal Inc. changed its name to Honeywell International Inc. ("Honeywell").

The Bendix Corporation was incorporated in the State of Delaware and maintained its principal place of business in the State of Michigan. Allied Corporation was incorporated in the State of New York and maintained its principal place of business in the State of New Jersey. AlliedSignal Inc. was incorporated in the State of Delaware and maintained its principal place of business in the State of New Jersey. Honeywell is incorporated in Delaware and maintains its principal place of business in New Jersey.

1244784 v.1

Honeywell is the successor-in-interest to AlliedSignal Inc. which, in turn, was the successor-in-interest to The Bendix Corporation. Honeywell's Friction Materials, LLC is the business unit within Honeywell that continues the "Bendix" line of automotive friction products.

The Interrogatories herein seek information for a period of 70 to 80 years. Individuals who may have had knowledge responsive to some of the Interrogatories are, due to the passage of time, deceased, or have faded memories, or are otherwise no longer available to Honeywell. Consequently, and notwithstanding the best efforts of Honeywell, potentially responsive information may have simply been lost before the time litigation ever commenced. Honeywell has, however, endeavored to obtain and record information from former employees of Honeywell, or its predecessors, if they were available to Honeywell through direct interviews and/or review of relevant deposition or trial testimony. In addition, Honeywell has searched its files for written or otherwise recorded materials that may contain information responsive to these Interrogatories. In that effort, documents in corporate headquarters and manufacturing facilities, to the extent that such documents still exist after the passage of many years, have been gathered and where relevant and responsive are made available for inspection and copying. Understanding that not every document or item of information could possibly be identified and referred to herein, Honeywell asserts that such documents may supplement, expand upon and/or provide more detailed response to these Interrogatories and therefore are incorporated by reference herein.

The responses to Plaintiff's Interrogatories, therefore, are based upon: (a) information supplied by employees of The Bendix Corporation or documents in the possession of The Bendix Corporation through March 31, 1985; (b) information or documents acquired by or known to employees of the Automotive Sector of Allied Corporation from April 1, 1985, through

1244784 v.1                                            2

September 29, 1987; (c) information or documents acquired by or known to employees of the Automotive Sector of AlliedSignal Inc. since September 30, 1987; (d) information or documents acquired by or known to employees of the Automotive Sector within Honeywell which has continued the "Bendix" line of friction automotive products since December 4, 1999; and (e) deposition testimony of Eugene Rogers, a former Bendix employee with knowledge of many of the issues raised by Plaintiff's Interrogatories.

In these responses, "Honeywell" refers to: (a) The Bendix Corporation prior to April 1, 1985; (b) the Automotive Sector of Allied Corporation from April 1, 1985 to September 29, 1987; (c) the Automotive Sector of AlliedSignal Inc. from September 30, 1987 through December 4, 1997; and (d) the friction materials business of Honeywell from December 4, 1999. Therefore, for purposes of these responses, the Defendant responding refers to the Bendix-related friction materials products. As the context of particular questions may require, the automotive friction products manufactured by Honeywell and its predecessors will be described by reference to their registered trademark, "Bendix." Questions directed to matters of corporate identity (*e.g.*, state of incorporation, principal place of business, etc.) are answered as they apply to Honeywell.

## COMMON OBJECTIONS

1. Honeywell objects to these Interrogatories to the extent they seek information protected by the attorney-client privilege, the attorney work product doctrine, and/or any other applicable privilege.

2. Honeywell further objects to these Interrogatories on the grounds that they are vexatious and oppressive.

1244784 v.1                                                3

(b)    Describe the results of each such test;

(c)    Identify each individual who participated therein and describe in detail the extent of his participation;

(d)    Identify each document which reflects, refers or relates to any information set forth in answer to this Interrogatory;

(e)    As to any information received orally in answer to this Interrogatory, identify each person who supplied such information and state the full substance of the information supplied.

**ANSWER**

17.    See Honeywell's Answer to Interrogatory No. 9(b).

**INTERROGATORY NO. 18**

18.    For each piece of equipment identified in answer to Interrogatory No. 9(b), describe what, if any, tests were made to determine the safety of said equipment and:

(a)    State when and where each such test was made;

(b)    Describe the results of each such test;

(c)    Identify each individual who participated therein and describe in detail the extent of his participation;

(d)    Identify each document which reflects, refers or relates to any information set forth in answer to this Interrogatory;

(e)    As to any information received orally in answer to this Interrogatory, identify each person who supplied such information and state the full substance of the information supplied.

**ANSWER**

18.    See Honeywell's Answer to Interrogatory No. 9(b).

**INTERROGATORY NO. 19**

19.    For each label, brochure, or other written material describing or relating to the use of each product identified in answer to Interrogatory No. 1., produced by you or any person associated with you or any related company or association:

(a)    Describe its contents;

(b)    State when, where, how, and to whom it was distributed;

(c)    State the manner in which it was placed on or in the product contained or whether it was separate from the product container, or whether it was separate from the product or container;

(d)    State whether any written, printed or graphic matter was present to warn of any harmful ingredient it might contain. If so, state:

(i)    Whether a signal word, i.e., "danger", "warning" or "caution" was present;

(ii)    Whether the signal word was printed in boldface, capital letters or different colored inks. Which?

(iii)    The wording of the statements describing any hazard;

(iv)    The wording of all directions and/or instructions pertaining to any method of use to avoid any hazard.

(e)    Identify each individual who participated in the writing of the label, brochure or other written materials and describe in detail the extent of his participation;

(f)    Identify each document which reflects, refers or relates to the information contained on the labels, brochures, or other written materials arid/or the decision to include such information;

(g)    As to any information received orally in answer to this Interrogatory, identify each person who supplied such information and state the full substance of the information supplied.

## ANSWER

19.    (a-c) Asbestos-containing friction products manufactured by Honeywell contain processed chrysotile asbestos fibers that were encapsulated or locked into the product itself. Together with various friction modifiers and fillers, the asbestos fibers were bound together with a resin binder system and then baked at a temperature in excess of 350 degrees. Exposure to or the proper use of Honeywell's friction products does not pose a health hazard. Although Honeywell does not believe that there is any health hazard associated with the proper use of its friction products, since at least as early as May 1973, a warning label has been placed on all cartons and boxes of asbestos-containing friction products shipped to customers.

Honeywell and its predecessors have taken these steps, and complied with OSHA warning regulations, even though it has never been determined that exposure to friction products results in an exposure to asbestos fibers equal to or in excess of OSHA exposure limits for asbestos fibers. From at least as early as May 1973 to August 1986 the warning label read as follows:

1244784 v.1                                16

CAUTION
CONTAINS ASBESTOS FIBERS
AVOID CREATING DUST
BREATHING ASBESTOS DUST MAY CAUSE
SERIOUS BODILY HARM

From September 1986 to June 2001 the warning label reads as follows:

DANGER
CONTAINS ASBESTOS FIBERS
AVOID CREATING DUST
CANCER AND LUNG DISEASE HAZARD

After Honeywell discontinued the manufacture and sale of asbestos-containing friction

products, it continued to label its non-asbestos-containing friction materials with cautions

concerning dust exposure.

(d)     In June 1973 Bendix issued General Bulletin G-73-6 to all rebuilders

regarding steps necessary to comply with the OSHA regulations, including a statement that

"[c]aution labels or lettering should be affixed to any carton or box that may have its contents

reground" in conformity with the OSHA language.  In 1977, The Bendix Corporation first

mailed to its distributors and rebuilder customers copies of the Friction Materials Standards

Institute's (FMSI's) Brake Lining and Clutch Facing Automotive Data Book which contained a

section entitled "Recommended Procedures For Reducing Asbestos Dust During Brake

Servicing."  Since 1977, subsequent editions of the FMSI Data Book (also containing a section

entitled "Recommended Procedures for Reducing Asbestos Dust During Brake Servicing") have

been distributed to customers by The Bendix Corporation and its successors (Allied

Corporation's Automotive Sector and AlliedSignal Inc.'s Automotive Sector).  In March 1979

The Bendix Corporation, by means of a general bulletin, mailed to its distributors and rebuilder

customers a Friction Materials Standards Institute publication (dated October 1978) entitled

"Friction Materials Work Practices Guide."  During 1984 and 1985 Allied Corporation's

Automotive Sector mailed "Product Fact Sheets" to all customers.  Beginning July 30, 1986,

Allied Corporation's Automotive Sector distributed a Material Safety Data Sheet to all

customers.  Beginning March 1, 1988, AlliedSignal Inc.'s Automotive Sector distributed a

Material Safety Data Sheet to all customers.

(e)-(f)  See above responses which disclose information germane to plaintiffs'

non-specific claims.

(g)    "Orally" based Interrogatories are objectionable for the reasons cited

above and incorporated herein.

## INTERROGATORY NO. 20

20.    For each product identified in answer to Interrogatory No. 1, state whether warnings of any harmful or potentially harmful effects of the product were printed on the cartons or packing cases in which individual containers were packed and, if so:

(a)    State the printed warning's contents;
(b)    State when the warning was used;
(c)    Describe the manner in which it was placed on or in the product container;
(d)    Identify each individual who participated in writing of the label or brochure and describe in detail the extent of his participation;
(e)    Identify each document which reflects, refers or relates to the information contained on the cartons or packing cases and the decision to include that information;
(f)    As to any information received orally in answer to this Interrogatory, identify each person who supplied such information and state the full substance of the information supplied.

## ANSWER

20.    See Honeywell's Answer to Interrogatory No. 19.

## INTERROGATORY NO. 21

21.    For each label, brochure, or other written material describing or relating to each process or method identified in answer to Interrogatory No. 9(b) produced by you or any person associated with you or any related company or association; and for each such label, brochure or written material:

(a)    Describe its contents;
(b)    State when, where, how, and to whom it was distributed;

# Exhibit H



## ALLIED CORPORATION
## BENDIX FRICTION MATERIALS DIVISION
# MATERIAL SAFETY DATA SHEET

The following data may be used to comply with OSHA's Hazard Communication Standard 29 CFR 1910.1200. The OSHA Standard must, however, be consulted for specific requirements.

The Friction Material products identified in this Sheet meet the OSHA definition of an "article" and are exempt from the Hazard Communication Standard as to all reasonable uses. Some potential may, however, exist for exposure to asbestos dust.

The ingredients in these Friction Material products are resin-bonded and cured. Hazards normally associated with exposure to or contact with pure dusts of the listed ingredients are not expected to be significant. Allied has listed all of the essential ingredients present in a series of Friction Material products of this general description. All Friction Material products identified on this MSDS contain processed chrysotile asbestos fibers, but may contain some of the other materials shown. The recommended exposure limits are those for the most hazardous substance in a class of substances. Exact formulations are proprietary and therefore confidential. Precise product information will not be disclosed, other than in accordance with applicable laws and regulations, or without a written Secrecy Agreement.

Allied shall in no event be responsible for any damages of whatsoever nature or kind directly or indirectly resulting from or arising out of the publication or use of or reliance upon data contained herein. No express or implied warranty of any kind, including, warranties of merchantability or fitness for use, with respect to the Friction Material products or to the data herein is made hereunder.

PRODUCTS — Bendix Friction Materials covered by this Material Safety Data Sheet can be identified from box labels or price lists as follows:

Drum Brake Segments and Blocks — "Friction King", "FK", "FKD", "D", "FKL", "L", "M", "AE", "E", "ED", "EM", "HP", "S", and "S-1100."

Disc Brake Pads — "Organic" and "FK II" (semi-metallic).

Note. The "wearing surface" of "FK II" disc pads does not contain processed chrysotile asbestos fiber. However, processed chrysotile asbestos fibers may be included in the "backing layer" which is "sandwiched" between the friction material and the steel shoe plate.

---

## SECTION I

Manufacturer's Name: ALLIED CORPORATION
        Bendix Friction Materials Division
Address: P.O. Box 238
        Troy, New York 12181

Emergency Telephone Number    518-273-6550
Date Prepared    July 30, 1986
Preparer    E.L. Rogers

---

## SECTION II — Hazardous Ingredients/Identity Information

| Hazardous Components (Specific Chemical Identity: Common Name(s)) | OSHA PEL | ACGIH TLV |
|---|---|---|
| Asbestos (Chrysotile) | 0.2 fiber/c.c. | 2 fibers/c.c. |
| Silica (oc quartz) | | |
| Silicate(s) | 10 mg/m³ | 10 mg/m³ |
| Carbon Black | 3.5 mg/m³ | 3.5 mg/m³ |
| Coke (Petroleum derived) | NA | NA |
| Cured phenolic and cashew resins | 10 mg/m³ | 10 mg/m³ |
| Graphite | " | " |
| Iron, Zinc, Aluminum and their oxides | " | " |

\* = Respirable Fraction as based upon the formula

$$\frac{10 \text{ mg/m}^3}{\% \text{ Silica} - 2}$$  (See OSHA table Z-1000)

---

## SECTION III — Physical/Chemical Characteristics

Boiling Point ............................... NA
Vapor Pressure (mm Hg.) ................... NA
Vapor Density (Air = 1) ................... NA
Solubility in Water ....................... NO
Appearance and Odor: Solid, Odorless, Light Tan to Dark Grey Color

Specific Gravity (H₂O = 1) ............. 1.6 - 3.7
Melting Point ............................ NA
Evaporation Rate ......................... 0

Plaintiff's Exhibit

BX-267

## SECTION IV — Fire and Explosion Hazard Data

Flash Point (Method Used): NA        Flammable Limits: NA        LEL: NA        UEL: NA
Extinguishing Media: Water, (Class A, B, or C), Fog or Foam
Special Fire Fighting Procedures: NA
Unusual Fire and Explosion Hazards: NA

## SECTION V — Reactivity Data

| Stability | Unstable: | | Conditions to Avoid: None Known |
|---|---|---|---|
| | Stable | X | |

Incompatibility (Materials to Avoid): None Known
Hazardous Decomposition or Byproducts: Incomplete combustion will create carbon monoxide and carbon dioxide.

| Hazardous Polymerization | May Occur: | | Conditions to Avoid: None Known |
|---|---|---|---|
| | Will Not Occur: | X | |

## SECTION VI — Health Hazard Data

Route(s) of Exposure:        Inhalation? Yes        Skin? Yes        Ingestion? Yes
Health Hazards (Acute and Chronic)

Some persons may be sensitive to partially cured phenolic or cashew resins and develop dermatitis-type reactions. Dusts of crystalline silica may produce silicosis. Metal dusts can be irritants of the eyes and upper respiratory system. There is little known evidence of chronic industrial poisoning from iron, aluminum, and zinc dusts.

Inhalation of concentrations of airborne asbestos fibers in excess of the OSHA limits may be hazardous to health and may cause serious bodily harm, such as asbestosis, lung cancer or mesothelioma. These diseases may not be recognized until many years after exposure. Medical literature indicates that people who smoke are at a significantly increased health risk when working with airborne asbestos fibers.

| Carcinogenicity Listing: | NTP? | IARC Monographs? | OSHA Regulated? |
|---|---|---|---|
| Asbestos fibers | Yes | Yes | Yes |

Signs and Symptoms of Exposure:

Partially Cured Cashew Resins — skin eruptions similar in appearance to poison ivy. Lung Effects from asbestos and crystalline silica — coughing, wheezing, shortness of breath, impaired pulmonary function. Dusts in eye may cause irritation. Gastrointestinal disturbances possible from ingestion.

Emergency and First Aid Procedures —

Should not be necessary from a proper handling of this Friction Material product.

## SECTION VII — SPILL OR LEAK PROCEDURES

Steps to be taken in case material is released or spilled:

Refer to Section IX (Special Precautions) below and "Recommended Procedures" on Page 4

Waste Disposal Method:

Dispose of in proper receptacles appropriately labelled in accordance with applicable federal, state and local laws and regulations

Place receptacles in an "Authorized Landfill" as designated by federal or state authorities.

## SECTION VIII — Special Protection Information

Respiratory Protection (Specify Type): Not Required under normal conditions.
However if concentration of airborne asbestos fibers in excess of the OSHA standard is created, respirators approved by NIOSH for asbestos fibers should be used.

Ventilation:
.during machining — including grinding and drilling)

Local Exhaust: Preferred

Mechanical (General): Not applicable

.tective Gloves: Recommended

Eye Protection: Safety Glasses Suggested

Other Protective Equipment:
See paragraph 7 of Recommended Procedures on Page 4

## SECTION IX — SPECIAL PRECAUTIONS

The Friction Material product, as shipped, is not considered hazardous, but machining (grinding and drilling) and/or normal use may create asbestos dust or airborne asbestos fibers in excess of OSHA standard and should be considered hazardous.

Recommended Precaution — If airborne asbestos fiber concentrations exceed OSHA limits, NIOSH approved respirators should be worn and proper engineering controls implemented. If product is ground or machined, local exhaust to control exposure to airborne asbestos fibers or dust is recommended. (See "Recommended Procedures" on Page 4.)

The work environment should be monitored to determine whether employee exposure exceed OSHA permissible exposure level in accordance with OSHA regulation 29 CFR Part 1910.1001.

Packages containing the Friction Material Product should be labelled in accordance with OSHA regulation 29 CFR Part 1910.1001 (j) (2) as follows:

**DANGER
CONTAINS ASBESTOS FIBERS
AVOID CREATING DUST
CANCER AND LUNG DISEASE
HAZARD**

Standard industrial hygiene practices, including good housekeeping and vacuuming or wet cleaning work surfaces to prevent asbestos fibers or dust from becoming airborne, should be instituted or implemented and maintained

"EE REVERSE SIDE FOR FRICTION MATERIALS STANDARDS INSTITUTE'S RECOMMENDED PROCEDURES FOR JUCING ASBESTOS DUST DURING BRAKE SERVICING.

# RECOMMENDED PROCEDURES FOR REDUCING ASBESTOS DUST DURING BRAKE SERVICING

Because studies have indicated that exposure to excessive amounts of asbestos dust may be a potential health hazard. OSHA has set maximum limits of levels of airborne asbestos dust to which workers may be exposed. Since most automotive friction materials normally contain a sizable amount of asbestos, it is important that people who handle brake linings and clutch facings understand the nature of the problem and know the precautions to be taken.

1  In regulated areas where brake work is done and the air quality standard exceeds the OSHA limit entrances should be posted with a warning sign as follows.

### DANGER
### ASBESTOS
### CANCER AND LUNG DISEASE HAZARD
### AUTHORIZED PERSONNEL ONLY
### RESPIRATORS AND PROTECTIVE CLOTHING
### ARE REQUIRED IN THIS AREA

2. The amount of asbestos in the dust from brake lining wear is normally at an extremely low level because of chemical breakdown during use. and if machining of friction material does not take place, simple procedures will minimize exposure  During brake servicing, the mechanic should wear a respirator approved by NIOSH for asbestos dust. it should be worn during all procedures starting with the removal of wheels and including reassembly.

3. When removing worn friction materials. remove the accumulated dust in the assemblies with an industrial vacuum cleaner equipped with a high efficiency filter system  If such equipment is not available dust can be removed with a damp cloth  Do not use compressed air or dry brushing for cleaning unless the assembly is enclosed and properly exhausted

4  Whenever possible, purchase friction materials pre-ground and ready for installation  If machining is necessary  the precautions which must be taken are of extreme importance. This is the operation in brake service when exposure to asbestos dust may be at its highest. This increases the difficulty in complying with the OSHA standards. In addition to the approved respirator, there must be local exhaust ventilation such that worker exposures are maintained below the OSHA asbestos standards. If there is any question as to the efficiency of asbestos dust removal by the machine. the manufacturer should be contacted

5.  Industrial vacuum cleaner bags containing asbestos dust and cloths used for wiping brake assemblies should be sealed in plastic bags and labeled with the following warning label printed in letters of sufficient size and contrast to be readily visible and legible.

### DANGER
### CONTAINS ASBESTOS FIBERS
### AVOID CREATING DUST
### CANCER AND LUNG DISEASE HAZARD

All asbestos waste should be disposed of in accordance with OSHA and EPA asbestos regulations. During removal of vacuum bags, an approved respirator, as described in (2) above should be worn.

6.  Good housekeeping is essential in a workplace where asbestos containing materials are handled  Industrial vacuum cleaners equipped with multiple stage high efficiency filters should be used for removing accumulations of asbestos dust and waste. Never use compressed air or dry sweeping for cleaning. Water or other dust suppressants should be applied if brooms are used.

7.  Good personal hygiene practices are important in minimizing asbestos dust exposure  Do not smoke  Wash before eating  Shower after work  Change to work clothes before work and change from work clothes at conclusion of work. Work clothing should not be taken home  Laundering of asbestos contaminated clothing should be done so as to prevent release of airborne asbestos fibers in excess of the exposure limits

### CAUTION: DO NOT BREATHE ASBESTOS DUST

Reproduced from the 1985 Friction Materials Standards Institute Automotive Data Book with the warning sign in paragraph 1 and the warning label in paragraph 5 revised to conform to OSHA Standard effective July 21, 1986.

# Exhibit I

*Friction Materials Standards Institute, Inc.*

370 LEXINGTON AVENUE
NEW YORK 17, N. Y.

September 30, 1971

To:  Members of Asbestos Study Committee

Subject: Proposed Emission Standard for Asbestos

Gentlemen:

In line with the discussions at the September 15, 1971 meeting of this Committee,
Dr. Stefl, Chairman, is forwarding the below listed write-ups to the members of this
Committee. We do not intend to distribute this data to the membership at large
until the Committee has had the opportunity to review both the Federal Proposal
and the draft of the AIA Comments and Suggestions.

(1)  Proposed Environmental Protection Agency
     Standards for Asbestos Emission.
          Comment:  Dr. Stefl felt it worthwhile that the Committee see this draft
                    copy, but he is certain that the Federal Standards will be
                    quite different.

(2)  Comments and Suggestions from Asbestos Information Association/North America.
          Comment:  These are the AIA Comments and Suggestions made regarding the
                    initial draft of the proposed Federal Standards at a meeting
                    held in Atlanta in mid-August.

Dr. Stefl further advised, and this is to be considered confidential, that he and
others from the AIA met with members of the Illinois Pollution Control Board on
September 17, 1971.  At this meeting he was advised that hearings would be held
at three locations on different dates in October, and that AIA/NA would give written
comments at the October 15 meeting in Chicago.  Personnel on the Control Board had
received comments from the motor companies on the brake lining ban.  They were not
aware of the E.P.A. tests on asbestos emission from brake lining that are being run
by Bendix Research Laboratories.

Copies of the minutes are enclosed.

                                        Sincerely,

                                        Executive Secretary

EWDrislane/icb

Messrs.: E. P. Stefl                    Raybestos-Manhattan, Inc.
         J. C. Henning                  Firestone Tire & Rubber Company
         E. H. Feierabend               Abex Corporation
         W. B. Reitze                   Johns-Manville Corporation
         E. Spurgeon                    The Bendix Corporation
         J. B. Graham, Jr.              Carlisle Corporation
         J. W. Greenen, ex-officio      Maremont Corporation
         L. D. Stickles, Counsel        Stickles, Hayden, Kennedy,
                                          Hort & Van Steenburgh



PLAINTIFF'S
EXHIBIT
BX-10

# Exhibit J



CLUTCH FACING AND BRAKE LINING STANDARDS INSTITUTE, INC.
370 LEXINGTON AVENUE, NEW YORK 17, NEW YORK

FIRST ANNUAL MEETING

OF THE

CLUTCH FACING AND BRAKE LINING STANDARDS INSTITUTE, INC.

NOW KNOWN AS

FRICTION MATERIALS STANDARDS INSTITUTE, INC.

THURSDAY, JUNE 23RD, 1949 AT 10 A.M.

AT THE

HOTEL COMMODORE, NEW YORK, N. Y.

PLAINTIFF'S EXHIBIT

THE PRESIDENT CALLED THE MEETING TO ORDER AT 10.00 A.M. AND ACTED AS CHAIRMAN.

MR. STICKLES WAS REQUESTED TO ACT AS SECRETARY.

THE CHAIRMAN CALLED UPON THE ACTING SECRETARY TO CALL THE ROLL AND REPORT THE NUMBER OF PERSONS PRESENT IN PERSON OR BY PROXY.

THE ACTING SECRETARY ANNOUNCED THAT THERE WERE SIX MEMBERS PRESENT IN PERSON AND FIVE REPRESENTED BY PROXY AS FOLLOWS:

| MEMBER | REPRESENTATIVE |
|---|---|
| FIBRE & METAL PRODUCTS, INC. | BEN FREIBAUM (PROXY) |
| GRIZZLY MANUFACTURING COMPANY | JOSEPH G. BROWN |
| LASCO BRAKE PRODUCTS CORPORATION, LTD. | WILLIAM H. DUNN (PROXY) |
| MARSHALL-ECLIPSE DIVISION, BENDIX AVIATION CORPORATION | WRIGHT TISDALE (PROXY) |
| MOLDED MATERIALS DIVISION, CARLISLE CORPORATION | GEORGE E. RITTER |
| RAYBESTOS-MANHATTAN, INC. | FRANK MILLER |
| RUSSELL MANUFACTURING COMPANY | AMOR P. SMITH |
| SCANDINAVIA BELTING COMPANY | VINCENT A. SPINA |
| SOUTHERN FRICTION MATERIALS COMPANY | WILLIAM H. DUNN (PROXY) |
| WELLMAN COMPANY, THE S. K. | T. A. NOVOTNEY (PROXY) |
| WORLD BESTOS CORPORATION | DONALD H. SPICER |

OTHERS PRESENT
RAYBESTOS-MANHATTAN, INC., WILLIAM H. DUNN
RUSSELL MANUFACTURING COMPANY LEO S. SULLIVAN,
LESTER D. STICKLES,
(LEGAL COUNSEL)

THE CHAIRMAN THEREUPON ANNOUNCED THAT A QUORUM OF THE MEMBERSHIP WAS PRESENT.

THE CHAIRMAN THEN APPOINTED MESSRS. BROWN, SPINA AND SPICER AS THE NOMINATING COMMITTEE TO PRESENT NOMINATIONS FOR THE ELECTION OF THE MEMBERS TO THE BOARD OF DIRECTORS.

ON THE REPORT OF THE OFFICERS, THE PRESIDENT INFORMED THE MEETING THAT THE SOLE AND SINGLE PURPOSE OF THE INSTITUTE WAS TO SEE THAT SERVICE WAS RENDERED TO THE MEMBERS BY THE PUBLICATION OF THE DATA BOOK, ALONG WITH BULLETINS PERTAINING

# Exhibit K

FRICTION MATERIALS STANDARDS INSTITUTE, INC., E. 210 ROUTE 4, PARAMUS, N.J.07652.

MINUTES OF THE MEETING

of the

ASBESTOS STUDY COMMITTEE

Thursday, August 17, 1972, at 9:30 A.M.

at the

Institute Office, E. 210 Route 4, Paramus, N. J.

PLAINTIFF'S
EXHIBIT
BX-1606

PLAINTIFF'S
EXHIBIT

## MEMBERS PRESENT

| | |
|---|---|
| I. H. Weaver, Chairman | Raybestos-Manhattan, Inc. |
| J. C. Henning | Firestone Tire & Rubber Co., World Bestos Division |
| W. Spurgeon | Bendix Corporation Bendix Research Laboratories |
| H. Wagner | Carlisle Corporation Molded Materials Division |
| E. H. Feierabend | Abex Corporation American Brakeblok Division |

## MEMBERS NOT PRESENT

W. B. Reitze                         Johns-Manville Corporation

## OTHERS PRESENT

| | |
|---|---|
| D. E. Stone | Bendix Corporation Friction Materials Division |
| E. W. Drislane | Friction Materials Standards Institute |

The meeting was called to order by Mr. Weaver, Chairman, at 9:30 A.M.

### MINUTES OF PREVIOUS MEETING

The Secretary read a summary of the Minutes of the Meeting held February 10, 1972. These minutes had been released and a motion for their acceptance had been obtained.

Upon motion duly made, seconded and unanimously passed, it was

RESOLVED:   To accept the minutes of the February 10, 1972 meeting as distributed.

### INTERPRETATION OF THE OSHA REGULATIONS

The Asbestos Information Association (AIA) met with representatives from OSHA late in June. The purpose was to interpret various individual requirements in the OSHA regulations. Letters from the AIA to their member companies, dated July 5, 1972 and July 12, 1972, were distributed to the Committee Members. In the first letter, they covered areas such as labeling, clothes lockers,






Minutes of Meeting
Asbestos Study Committee        -2-        August 17, 1972

respirators, monitoring and physical examinations, citations, OSHA inspections and employee notification. In the second letter, the AIA distinguishes between non-locked-in asbestos containing products, (which would be brake lining and clutch facings). There are certain labeling requirements tied in to the non-locked-in containing asbestos products, but this letter also discussed the problems of subsequent working of locked-in asbestos containing products.

The members discussed some of the items in the OSHA regulations. One member indicated that during an inspection, there were 3 OSHA people at their plant for 7 to 8 days. Interestingly, the 3 OSHA people came on site the first day wearing respirators. Whether this was for effect or is a standard procedure for OSHA was not known. One of the items pointed out by an OSHA inspector on the scene was the dry sweeping of loose asbestos-type compounds vs. the wet sweeping or vacuum cleaning that OSHA calls for. Another member advised that they had taken out all air hoses around briquette presses and other machinery where loose asbestos is handled before it becomes locked in. Surprisingly to some members, asbestos sampling indicated that the inspection and drilling locations were problem areas. One member required that the respirators be worn at all drilling locations.

In an inspection at one member's plant, the OSHA people set up 5 stations and while 4 of them sampled below the 5 fiber per cc TWA, one station read 18 fibers per cc TWA. This member was cited (in averaging the readings).

When the Federal Government was considering the necessity for asbestos regulations, two of the companies represented by Members on the Committee were asked to cooperate in a survey by NIOSH. This study by NIOSH was to check over medical records and other such items to attempt to put the problem in prospective. NIOSH had indicated to the cooperating manufacturers that the information they were providing would be kept confidential. However, as it turns out, the OSHA people have copies of the NIOSH studies which would indicate that the confidentiality has been violated.

A member questioned what happens when the asbestos concentration in a work area exceeds 10 fibers per cc (the ceiling concentration in the OSHA regulations). The answer is that the employer must notify the worker so exposed, in writing, that he was exposed to such a concentration and the worker must wear a respirator in that area. The next question concerned what the proper means for notification of the worker would be. If an interpretation is officially asked of OSHA, they will indicate that a registered letter to the employee is the proper means of notification. In other areas, OSHA has indicated that meeting the spirit of the law is what counts and it is felt that bulletin board notification would suffice.

The next question concerned respirators. It was indicated that there were 3 / disposable respirators approved by the Bureau of Mines, and these are manufactured by the A. O. Smith Company, Welsh, and Minnesota Mining and Manufacturing (MMM). Respirators furnished employees must have a proper fit and the employees must be instructed both as to the fit and the servicing of the respirator. Responsibility for testing and approval of respirators for protection against asbestos dust recently was transferred from Bureau of Mines to NIOSH. Until NIOSH approvals are issued, it is recommended only respirators (reusable or disposable type) having Bureau of Mines approval specifically for use on asbestos dust be used in asbestos contaminated atmospheres.

Minutes of Meeting
Asbestos Study Committee                    -3-            August 17, 1972

## LABELING PRACTICES

There are 3 areas for concern on labeling. One is the handling of the loose
asbestos fiber from the point where it is received to the point where it is
mixed and briquetted. The next is the handling of the products with supposedly
locked-in asbestos during subsequent operations, such as drilling, grinding,
inspection and boxing. The last concerns the handling of the brake lining or
clutch facing by the customer where he may also do some drilling or grinding
before the lined assembly is a finished product.

It was reported during this topic that there was a higher concentration of
asbestos in the air in the Inspection Department than most members had realized
One member indicated that when pallets of brake linings were shipped there
apparently is additional dust created during transportation. The question of
surface dust on the working surface of a brake lining or a clutch facing was
discussed. Where members have taken action to reduce the dusty type surface,
they have found that they have actually altered the frictional characteristics
of the material during the early miles on a vehicle. In other words, the
brakes are not very responsive during the early mileage after reline.

In the AIA recommendations, it is suggested that where a manufacturer is shippi
his brake linings or clutch facings (locked-in-asbestos products) he should
notify the user of his product to the effect, "Power bench saws without collecto
should not be used in cutting this product. If this is impractical, operators
should be provided with a Bureau of Mines approved respirator." It was
suggested that a notification be put in boxes of brake linings or clutch facing
being shipped to customers. A sample of the caution labels suggested is
attached to these minutes. Mr. Feierabend indicated that this recommendation
would not be accepted warmly by many manufacturers. Mr. Wagner objected to the
recommendation that warning notices be put in the brake linings as he felt it
was another "red flag" that would bring more harm to the industry than the
alleged good that would come from enclosing such notices. Several members have
had customers call in to their Sales Departments asking if the handling of
locked-in-asbestos in brake linings and clutch facings is a hazardous condition.
Another asked if this notifcation was a requirement of the OSHA regulations.
It was indicated that this was not specifically required by the OSHA regulation
The concern is, do those customers doing additional grinding and drilling of
the brake linings or clutch facings create working conditions where the con-
centration of asbestos would be a hazard. Since small manufacturers are exempt
from the OSHA regulations, they will probably not be running tests. Larger
customers will, of course, be covered under the OSHA regulations and it is
expected that tests will be run in these manufacturers' work areas. Whether
the Institute would recommend such labeling in finished products shipped to the
customers was not decided. It was felt that this subject should receive furthe
consideration from the Members of the Committee before a recommendation is made.
One member commented that there were instructions by some manufacturers advisin
that blowing out the wear debris from used brakes was not recommended.

This subject of recommending that brake lining and clutch facing manufacturers
include a warning sheet in their shipments appears to be somewhat controversial
and it is suggested that this matter receive some serious discussion by the
Members of the Committee with those responsible at their companies. This item
will ____ definitely be ___ __ agenda for the next meeting of the Asbestos Study



Minutes of Meeting
Asbestos Study Committee                    -4-          August 17, 1972

## SAMPLING FOR ASBESTOS FIBER COUNTING

Mr. Stone questioned the possible movement of asbestos inside the filter sample when sent to the lab for examination. Mr. Weaver indicated that this possibility was quite remote. Apparently the question arose after an OSHA visit to the member's plant. In response to a question, one member indicated it takes about two months from the OSHA sampling until the OSHA report is received. Further, it was indicated that the company hears if it is to be cited and not if the conditions are satisfactory. The OSHA regulations call for an eight hour time weighted average (TWA) for the measurement of air-borne concentration of asbestos fibers. One member indicated that he runs his sample test for a continuous four hours to compute the concentration. With a continuous four hour sampling, there are sometimes reactions from the shop people.

Returning to the question on sampling for fiber counting, OSHA recommends a full straight eight hour sample. It was indicated they used 8 filters during this continuous sample. A member suggested using 90 minute sampling for most areas, or a complete job cycle if it took longer than 90 minutes. He recommended four hours of sampling for specials. A member questioned as to what minimum time was necessary in sampling to determine the peak concentration that cannot exceed 10 fibers per cc. No specific answer was given, but Mr. Weaver indicated some sampling procedures which he felt were optimum for counting fibers entrapped by the filter. The number of tests for various conditions is suggested in this tabulation. One condition is where you are measuring friction materials with asbestos in the compund, and the other is for areas where you are handling all asbestos.

Optimized time for fiber collection - depending on TWA fiber per cc concentratio expected in area. (Optimum for counting fibers on the filter)

| Friction Materials TWA Fibers per cc | Optimum Number of Tests | All Asbestos TWA Fibers per cc |
|---|---|---|
| 0- 5 | 1-8 hr. test | 0- 3 |
| 5-10 | 2-4 hr. tests | 3- 6 |
| 10-15 | 3 tests, 3,3,2 hrs. | 6- 9 |
| 15-20 | 4-2 hr. tests | 9-13 |
| - | 8-1 hr. tests | 13-20 |

The question arose concerning the sample, where one is trying to pick up asbestc for counting. What about the other fibrous materials in brake lining that are not consid hazardous? Might these not be counted on the filter as well as asbestos? One answer that is indicated for the skilled laboratory man making the examination is that he should be able to distinguish between asbestos fibers and other materials. Further, one can go to 800X on the microscope and get a closer look at the materials picked up on the filter. Dr. Spurgeon indicated that one can use low temperature ashing to remove resins and other organic materials (primarily friction dust).



PLAINTIFF'S
EXHIBIT 8732
8f-166

Minutes of Meeting
Asbestos Study Committee                                           -5-                August 17, 1972

## EPA AUTOMOTIVE EMISSIONS

Dr. Spurgeon indicated that the Bendix Research Laboratories are working
under contract for EPA on particulate emissions from brake linings and clutch
facings and will not be finished until March 1973. Dr. Spurgeon felt it would
not be proper to discuss results and progress to date on this study under
contract to the government.

## THE STATUS OF EPA REGULATIONS

Mr. Weaver indicated that one of the reasons for scheduling this meeting in
August was to go over the new EPA regulations. However, this agency has not
finalized their regulations as yet and it is not expected to be published until
sometime in September. Mr. Weaver indicated that the problem was not with the
asbestos sections, but rather with some of the other materials and he expected
that their regulations will not be very much different from the earlier
temporary regulations on asbestos. Once again, those earlier regulations were
more concerned with control practices (collectors and disposal techniques) than
with numerical emission values. No further action can be taken in this area
until the EPA regulations are published.

## CONSIDERATION OF SUBSTITUTES FOR ASBESTOS

At the Annual Meeting, in June, this Committee was directed to consider a
recommendation that the Institute sponsor a research study to determine the
possibilities of substitutes for asbestos. The purpose of this suggestion
was that if an outside study were to show that certain materials might very
well be acceptable substitutes for asbestos, the information would be made
available to the members. If the outside study indicated that there were no
satisfactory substitutes for asbestos in friction materials, this information
could be used as a defense should we have a recurrence of action similar to
Illinois' banning of asbestos based brake linings. The Committee discussed this
and as most of them are working on asbestos substitutes and some, in particular,
have marketed materials without asbestos (primarily metallics), they felt this
suggestion would not be warmly received by many members. One member indicated
that it would be very difficult for them to sanction the Institute making any
such study considering the work they have done in the past.

Upon motion duly made, seconded, and unanimously passed, it was

> RESOLVED: That the Asbestos Study Committee does not recommend an Institute
> study in the area of substitutes for asbestos.

## WASTE DISPOSAL

Someplace between the point where the asbestos product is finished and the
waste materials are disposed of, the OSHA requirements will become EPA require-
ments. In other words, we are moving from the condition of standards in the
work place to standards in the atmosphere or environment. The area of waste
disposal is a major problem. All asbestos bearing wastes, according to the OSHA
regulations, must be collected and disposed of in sealed impermeable bags or
other closed impermeable containers. Whether a closed steel truck body is
considered "impermeable" is a question. If the OSHA people mean what they say





Minutes of Meeting
Asbestos Study Committee                    -6-        August 17, 1972

when they suggest that an employer who is attempting to meet the spirit
law will not have difficulty, it will be assumed that removal of the was
material in enclosed steel truck bodies would be an acceptable means of
disposal. Most members indicated that they had great difficulty with po
bags - they are too soft and they tear when they are stacked. The next
which is a major problem, is the actual disposal of the dust. Usually,
unloaded as land fill. One member uses a screw-type conveyor to fill a
with a fixed container. The material is then dumped into land fill. Th
material is wet down after dumping and, after a hole is filled, it is co
Mr. Stone mentioned a procedure he had seen where they turn the dust int
pellets and dispose of the pellets. One member indicated a solution for
disposal of the paper bags that are used to package the asbestos. They
the asbestos bag inside a hood where they cut the bag. The hood has an
plastic bag which the asbestos bags are picked up in.

The topic of proper disposal of the friction material waste products was
discussed. The most desirable method of disposing of friction material
products is to put it back into the friction material. Where a manufact
has a one-formula product line, this is reasonable. However, most of th
manufacturers would find it very difficult to segregate the various mixe
up in their collection devices and recycle it back into the friction mat
without running into product problems. This is obviously the most desir
thing to do with the waste material, but for turning out a quality produ
becomes very difficult. The most common means of disposal are to wet th
product down and dispose of it as land fill. In some areas the material
bagged and sent to the dump. The problem of economical means to dispose
waste from friction materials has been a problem in the industry for mar
It is likely to become a much more perplexing problem considering the re
by OSHA and EPA. Dr. Spurgeon brought up the question of the possibilit
the Institute sponsoring paid research on waste disposal. It was indica
within the Constitution and By-Laws of the Institute we could very well
such research but it would be up to the Committee to make recommendation
this area. Generally, there are areas other than asbestos that are invo
this waste disposal problem. Among the items to be considered are: gri
dust, asbestos fibers and bags, phenolics which are picked up in wet scru
lead and its compounds, and the solvents that are driven off during proc
The Committee will consider this possibility at a subsequent meeting.

A member suggested a possible questionnaire to be sent out to the Member
concerning the problems of waste disposal to see whether the rest of the
Membership could contribute some information in this area and to determi
extent of interest in the study of waste disposal by the Institute. The
of the Committee should consider items to be included in such a question
for discussion at the next meeting of the Committee.

### MATERIALS OTHER THAN ASBESTOS

Because the problem of waste disposal is not a problem of asbestos only
were raised about the possibilities of extending the scope of the Commi
work beyond that of asbestos alone. The Secretary indicated that it wo
within the scope of the Committee to extend their activity to materials
than asbestos. Lead and lead compounds are among the hazardous materia
regulated by Federal agencies. As many manufacturers use lead and lead



Minutes of Meeting
Asbestos Study Committee                    -7-        August 17, 1972

in their friction materials, this might be a material to be studied by the
Committee. On the other hand, because of the seriousness of the asbestos
regulations, by taking on other materials, the efforts of this Committee
might be diluted. Currently, there are regulations on solvents, silica,
and other materials considered hazardous or noxious by the regulatory agencies.
It is requested that the members consider the possibilities of expanding the
activities of this Committee to cover other materials.

## METHODS FOR EXAMINATION OF FIBERS

Dr. Spurgeon questioned whether there were any other reliable techniques for the
measurement of asbestos fibers other than the membrane filter method. The
question was also aimed at whether the regulatory agencies were considering
other analytical methods. Mr. Weaver indicated that in conversation with AIA
he had recently learned that the Department of Labor is considering a study on
the possibilities of the gravimetric method for sampling asbestos fibers. He
indicated that the membrane filter method would be in use for some years to
come and possibly up to the July 1976 date when the stiffer two fiber per cc
requirement goes into effect. The Department of Labor is considering a 15 man
committee to study this possibility for sampling the asbestos. The make-up of
such a committee would be as follows: 4 from industry, 4 "experts," 1 from NIOSH,
1 academic, 2 from labor, 1 medical, 1 from the American Industrial Health
Association, and 1 consumer advocate. It is suggested that members of the
Asbestos Study Committee consider whether their companies might wish to volunteer
for service on such a Federal committee.

## OTHER BUSINESS

Some of the Committee Members are operations oriented and others are environment
oriented. It was requested that those individuals responsible for corporate
decisions in the hygiene environment area be listed. That list is as follows:

| | |
|---|---|
| Charles Borcherding | Abex Corporation – Chicago, Illinois (Corporate Industrial Hygiene) |
| James Armstrong | Bendix Corporation – Southfield, Michigan (Safety Director) |
| Ike Weaver | Raybestos-Manhattan, Inc. – Manheim, Pa. (Director of Environmental Control) |
| George Wilson | Firestone Tire & Rubber Co. – Akron, Ohio |

*  *  *  *  *  *  *

There being no further business brought before the Committee, upon motion duly
made, seconded and unanimously passed, it was

    RESOLVED:  To adjourn

Adjourned at 4:00 P.M.

Distribution: Committee Members        E. W. Drislane
              J. Greenen              Executive Director
              L. Stickles
              British Council
              AIA/NA

# — CAUTION —

Contains Asbestos Fibers

Avoid Creating Dust

Breathing Asbestos Dust
may cause serious Bodily Harm

The "Instruction Sheet" should be the same size as the caution label, black on white and should read as follows:

IMPORTANT

POWER TOOLS WITHOUT DUST COLLECTORS SHOULD

NOT BE USED FOR MACHINING, CUTTING OR SANDING

THIS PRODUCT.

IF THIS IS NOT PRACTICAL, OPERATOR SHOULD BE

PROVIDED WITH A U.S. BUREAU OF MINES APPROVED

RESPIRATOR.